## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

LINCOLN MEMORIAL ACADEMY;
EDDIE HUNDLEY; MELVIA SCOTT;
JAUANA PHILLIPS; KATRINA
ROSS; and ANGELLA ENRISMA

       Plaintiffs,

v.                                                          Case No: 8:20-cv-309-CEH-AAS

STATE OF FLORIDA,
DEPARTMENT OF EDUCATION;
SCHOOL DISTRICT OF MANATEE
COUNTY, FLORIDA[1]; and THE
CITY OF PALMETTO,

       Defendants.

_____

### O R D E R

This cause comes before the Court upon Defendant State of Florida, Department of Education's Motion to Dismiss Second Amended Complaint with Prejudice (Doc. 112), Defendant Manatee County School Board's Motion to Dismiss Plaintiffs' Second Amended Complaint with Prejudice (Doc. 118), and the City of Palmetto's Motion to Dismiss Second Amended Complaint with Prejudice (Doc. 119). Plaintiffs Lincoln Memorial Academy, Eddie Hundley, Melvia Scott, Jauana

---

[1] The School Board of Manatee County contends that it is the proper defendant, not the "School District of Manatee County," since it serves as "the entity charged with adopting and providing for the execution of plans in the establishment, organization, and operations of the schools in the district." Doc. 118 at 1 n.1 (citing Florida Statutes § 1001.42(4)). The parties have proceeded in the litigation accordingly.

Phillips, Katrina Ross, and Angella Enrisma respond in opposition (Doc. 113, 150 152). The School Board has also replied (Doc. 202) and Lincoln Memorial has sur-replied (Doc. 295) on a limited issue, to which the School Board responds (Doc. 301).

These filings also pend: Plaintiffs' Motion for Judicial Notice of Certain Adjudicative Facts Contained in the Court Record (Doc. 296) and the City of Palmetto's response in opposition (Doc. 302); Plaintiffs Lincoln Memorial Academy and Eddie Hundley's Motion to Substitute/Motion to Join Commissioner of Education Richard Corcoran as a Party Defendant Pursuant to Rules 15 and 21 of the Federal Rules of Civil Procedure (Doc. 288) and the Department of Education's response in opposition (Doc. 292); the Motion for Reconsideration: Objection to Order of Dismissal and Motion to Vacate (Doc. 282) and the Department of Education's response in opposition (Doc. 284); and Lincoln Memorial Academy's Motion for Order Granting Partial Summary Judgment in Favor of Plaintiff Lincoln Memorial Academy (Doc. 283) and the School Board's response in opposition (Doc. 289).

## I.    BACKGROUND

### A. Introduction

Ordinarily, the Court would begin with a recitation of relevant facts. But this action's painfully confusing development demands a different approach. Plaintiffs Lincoln Memorial Academy ("LMA"), Eddie Hundley, Dr. Melvia Scott, Jauna Phillips, Katrina Ross, and Angella Enrisma (collectively, "Plaintiffs") bring this action. Some of them initiated the action on February 11, 2020 (Doc. 1). The First Amended Complaint followed shortly thereafter (Doc. 6). With exhibits, that pleading

was 96 pages long. The Court dismissed it, without prejudice, as a shotgun pleading. Now, the operative pleading is the 69-page Second Amended Complaint (Doc. 108). With exhibits, it swells to 237 pages. It, too, is a shotgun pleading.

The School Board of Manatee County ("SBMC"), the City of Palmetto (the "City") and the State of Florida, Department of Education (the "Department" and, together with the SBMC and the City, "Defendants") have moved to dismiss (Docs. 112, 118, 119). An earlier order stayed all case-management deadlines until the Court issued a ruling on the motions to dismiss. Doc. 243 at 5; *see also* Doc. 250 at 2. Notwithstanding that order staying the case-management deadlines, LMA filed three motions for summary judgment (Docs. 244, 245, 246). For nearly three hours, the Court held oral argument on the motions to dismiss (Doc. 278). At the hearing, the Court announced that it would grant the Department's motion, but advised the parties to rely on a subsequent written order. The Court also advised that it would take under advisement SBMC's motion and the City's motion. Numerous motions followed oral argument *See*, *e.g.*, Docs. 282, 283, 288, 296.

The parties have patiently awaited rulings on the motions to dismiss. To be sure, the Court has not ruled on those motions as quickly as anticipated. This delay has resulted from several factors, including but not limited to, the inartful pleading of the Second Amended Complaint, an avalanche of filings on the docket, and the backlog of criminal jury trials over which the undersigned has presided, caused by the suspension of jury trials due to Covid-19. But the parties need not wait any longer; today, those rulings arrive. For the reasons set forth below, the Court will dismiss the

Second Amended Complaint as a shotgun pleading, grant the Department's motion to dismiss, grant the City's motion to dismiss, and grant-in-part and deny-in-part SBMC's motion to dismiss. The Court will dismiss the Second Amended Complaint, with prejudice.

### B. Factual Background[2]

#### i. *Revocation of Hundley's Certificate*

From 2014 to 2018, Eddie Hundley served as the principal of Lincoln Middle School in Palmetto, Manatee County, Florida. Doc. 108 ¶91.[3] In 2016, after a parent informed Hundley that her foster daughter's diary indicated that her daughter had entered into a relationship with Quintin Peterson, a teacher who worked at Lincoln Middle School, Hundley removed Peterson from the classroom, notified the Manatee County School District,[4] and initiated a misconduct investigation. *Id.* at ¶¶91, 94. After the investigation was closed as "unfounded," Peterson returned to work. *Id.* at ¶94. A later complaint about Peterson's conduct with a female student resulted in an investigation, Hundley again removed Peterson from the classroom, and the investigation concluded as "unfounded." Doc. 108 ¶95, Doc. 108 at 103–104. School

---

[2] The facts are derived from the Complaint, the factual allegations of which the Court must accept as true in ruling on the Motion to Dismiss. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

[3] When citing to the Second Amended Complaint, paragraph numbers refer to paragraphs in the Second Amended Complaint, whereas page numbers refer to pages of the Second Amended Complaint, which include some of the attached exhibits. Other exhibits attached to the Second Amended Complaint are located at Doc. 108-1.

[4] Given the phrasing of allegations in the Second Amended Complaint, this order refers to the School District of Manatee County and SBMC interchangeably in certain portions.

Superintendent Diana Green ordered Hundley to issue a letter of reprimand to Peterson. Doc. 108 ¶95; Doc. 108 at 104. When a third allegation about Peterson conducting an inappropriate affair with a female student occurred, Peterson was again removed from the classroom. *Id.* at ¶96. Authorities conducted an investigation and closed the case. *Id.* at ¶96. When the investigation was closed, Hundley and Assistant Principal Darlene Proue, a Caucasian female, inquired when Peterson could return to work. *Id.* at ¶96. The Palmetto Police Chief "misled" Hundley and Proue "into thinking that the investigation ha[d] been completed." *Id.* at ¶97. They reasoned that Peterson could return to work because the investigation had concluded. *Id.*

The Sarasota County School District contacted Hundley and Proue for a professional reference for Peterson after he applied for employment with the District. *Id.* at ¶98. Proue responded to the District's questionnaire about Peterson's character and qualifications during a telephone call. *Id.* at ¶99. On the other hand, Hundley answered an email reference request. *Id.* Hundley and Proue provided positive references for Peterson. *Id.* at ¶100. Like Proue, Hundley did not inform the District about Peterson's earlier misconduct investigations. *Id.* at ¶101. Hundley and Proue determined that Peterson was "innocent until proven guilty" and "had been cleared or exonerated," even though he had been the subject of earlier investigations. *Id.* In completing a digital reference form, Hundley placed Peterson in "the top 5%." *Id.* at ¶102. Peterson worked for the District following his "permanent[]" hiring in February

of 2018 until his date of arrest for alleged possession of child pornography in April of 2018. *Id.* at ¶103.

In 2018, the Manatee County School District reported Hundley to the Florida Department of Education for having committed an ethics violation by providing a positive reference for Peterson. *Id.* at ¶104. No action was taken against Proue. *Id.* On March 8, 2019, an administrative law judge recommended, in relevant part, that Hundley's educator's certificate be revoked for five years. *Id.* at ¶105; Doc. 108 at 127. On May 13, 2019, having adopted the administrative law judge's findings of fact and conclusions of law, the Education Practices Commission revoked Hundley's educator's certificate for five years. Doc. 108 ¶105; Doc. 108 at 95.

### ii. *LMA's Launch and Shut-Off Notice*

Hundley founded LMA, a conversion charter school. Doc. 108 ¶3–4. Hundley served as both chief executive officer and principal of the school. *Id.* at ¶4. LMA received authorization to take over the operations of the administration of Lincoln Middle School. *Id.* at ¶20(A). LMA launched during the 2018-2019 school year. *Id.* at ¶20(B).

From September of 2018 through June 18, 2019, LMA encountered "slow-pay issues" as to payment of its monthly water bills to the City. *Id.* at ¶24. A June 13, 2019 utility bill from the City provided a "past due" amount of $12,439.23, listed "current charges" in the amount of $3,216.67, and indicated that the due date was July 5, 2019. *Id.* at ¶25; Doc. 108 at 73. LMA and the City had allegedly entered into a "repayment agreement" to alleviate LMA's payment difficulties. *Id.* In support of this allegation,

LMA cites to a June 13, 2019 email, attached to the Second Amended Complaint, in which a representative of the City's utility billing customer service supervisor wrote to an LMA representative that an account was "currently past due" and to inquire when the City "could expect the payment check per . . . our payment arrangement." Doc. 108 at 75; *see* Doc. 108 ¶25. On the same day, the LMA representative responded: "We will be back on track with the twice per month payments in July. 15th and 30th." Doc. 108 at 75. Plaintiffs allege that, in accordance with this e-mail, LMA issued a payment to the City on June 15, 2019. Doc. 108 ¶25.

On June 18, 2019, despite the alleged repayment agreement, Palmetto Mayor Shirley Bryant emailed Cynthia Saunders to advise that based on the City's "standard collection policies of [its] utility accounts," the City needed to take action. *Id.* at ¶26; Doc. 108 at 71. Bryant advised that a notice including "a termination of service date" would likely be mailed to LMA by the close of business that day. *Id.* On the same day, LMA disbursed payment for $12,439.23. *Id.* at ¶26; *see* Doc. 108 at 82. Also on the same day, Bryant sent an email to Saunders, stating that LMA had "brought [its] account up to current." Doc. 108 ¶26; Doc. 108 at 77.

As such, from June 18, 2019, until "on or about July 22, 2019," LMA's water bill was "current." Doc. 108 ¶27. On July 22, 2019, Bryant ordered the City's utility billing supervisor to "create and mail" a "45-day delinquency shut-off notice." *Id.* A July 22, 2019 e-mail from the utility billing customer service supervisor to Saunders indicated that a July 22, 2019 shut-off notice for LMA was attached to the email and that the notice was e-mailed to an LMA representative and hand delivered with

signature of receipt. Doc. 108 at 138. The July 22, 2019 shut-off notification indicated that the minimum amount due was $3,216.67 and that the due date was July 29, 2019. *Id.* at 141. It also stated: "The above utility account is now 45 days past due. At this time, the entire past due balance is owed . . . . To avoid shut-off, please arrange to pay the past due amount of $3,216.67 on or before 5:00 p.m. on July 29, 2019. If payment is not received, the above account's utility services with the City of Palmetto will be shut-off on Tuesday, July 30, 2019." *Id;* Doc. 108 ¶27. This shut-off notice "effectively revoked or cancelled the repayment agreement" between LMA and the City. Doc. 108 ¶27. Plaintiffs allege that Bryant and the utility billing customer service supervisor knew, or should have known, that the LMA's water bill was not 45 days past due. *Id.* at ¶28.

### iii. Letters from Commissioner Corcoran

On July 16, 2019, then-Education Commissioner Richard Corcoran sent two letters: (1) a letter to Saunders and SBMC Chair Dave Miner; and (2) a letter to LMA's board members. Doc. 108 ¶29.[5] In the letter to Saunders and Miner, Corcoran wrote:

> It gives me great concern to know that Eddie Hundley, an individual whose Florida Educator's Certificate has been revoked for issues related to the safety of students, continues to serve in an administrative capacity at Lincoln Memorial Academy, a charter school sponsored by your district. Mr. Hundley deliberately facilitated the continued exposure of students to an individual against whom repeated allegations had been lodged of inappropriate contact and relationships with underage female students and who is currently facing criminal prosecution as a result.

---

[5] On its own, the Court takes judicial notice of the fact that Manny Diaz, Jr., now serves as education commissioner. *See* Fed. R. Evid. 201(b)–(d).

. . .

> In January of this year, an administrative law judge determined
> that Mr. Hundley failed to protect the health, safety, and welfare
> of students, that he lied and that he lost credibility as an effective
> educator. It is unacceptable that Mr. Hundley continues to be
> employed as an educator and I wholeheartedly support action by
> the district to rectify this situation by making every effort to have
> Mr. Hundley relived of all responsibilities with Lincoln
> Memorial Academy.
>
> On May 13, 2019, the Education Practices Commission issued a
> final order immediately revoking Eddie Hundley's teaching
> certificate for a period of five years, stripping him of all rights of
> a Florida certified educator and legally precluding him from
> holding a position, whether paid or voluntary, that brings him
> onto a public school campus while students are present.

Doc. 108 at 85.

Plaintiffs allege that Corcoran's statement about Hundley's deliberate
facilitation "excoriate[d] and impugned" Hundley's "professional reputation,
character, and standing amongst fellow professionals." Doc. 108 ¶29.

In the letter to LMA's board members, Corcoran wrote:

> Mr. Eddie Hundley's teaching certificate has been revoked for
> five years. As a result, he cannot be employed in a position that
> requires direct contact with children. As members of the
> Governing Board, it is incumbent upon you to ensure that all
> funds are lawfully expended.
>
> Charges against Mr. Hundley have been reviewed by two
> independent authorities, the Division of Administrative
> Hearings (DOAH) and the Education Practices Commission
> (EPC), both of which are statutorily separate from and immune
> from influence by the Department of Education . . . . As a result
> of the hearing, the administrative law judge filed a 33-page
> decision that carefully reviewed the evidence and the credibility
> of the witnesses and determined that Mr. Hundley had in fact
> jeopardized the health, safety, and welfare of students and that
> he subsequently lied about his knowledge of allegations of
> inappropriate sexual relationships with underage female students
> by a former member of Mr. Hundley's teaching staff . . . . The

EPC panel agreed with and adopted the administrative law judge's recommended order.

. . .

As a result of the actions taken by the EPC, Mr. Hundley cannot legally perform the duties of a school administrator. For the Governing Board to continue to allocate funds for his services is, on its face, contrary to the best interests of the students. This conclusion is reinforced by the fact that the school is facing a financial emergency.

. . .

It is undisputed that the financial status of Lincoln Memorial Academy falls within the statutory definition of financially deteriorating as defined by § 1002.345(1)(a), F.S., and notice of the same has been provide to the Department by Manatee County School Board. The same statute provides that in the event of a failure on the part of the district and a charter school governing board to agree to a corrective action plan within 30 business days of notification to the Department, the Commissioner of Education shall determine the components of an acceptable plan.

. . .

If I do not receive a corrective action plan that the School Board and the Governing Board agree upon by Tuesday, July 23, 2019, I will establish a plan in keeping with the requirements of section 1002.345, F.S. In addition, by July 23, 2019, please provide documentation along with written assurance from the Chair of the Governing Board, that Mr. Eddie Hundley has been terminated as an employee and that the Governing Board is not making any payments to him.

Doc. 108 at 88–89.

According to Plaintiffs, Corcoran "knowingly and intentionally misstated" the language of the orders suspending Hundley's license. Doc. 108 ¶32. They allege that neither the EPC's order nor the administrative law judge's recommended order restricted him from holding an administrative position within a charter school; instead,

those orders only revoked his teaching certificate for five years and imposed a fine of $2,400. *Id.* at ¶¶33, 35. They allege that Corcoran's statement in the first letter that the EPC order revoked Hundley's teaching certificate, "stripping him of all rights of a Florida certified educator and legally precluding him from holding a position, whether paid or voluntary, that brings him onto a public school campus while students are present" adopted "far more restrictive language" than the EPC order. *Id.* at ¶33. As such, Plaintiffs allege that Corcoran's letters "were seemingly and apparently material misrepresentations of law, designed, whether unwittingly or not," to impose upon Hundley and LMA "far more stringent standards" than what were actually imposed in the recommended order and the EPC's order. *Id.* at ¶37. On this basis, when the School District of Manatee County "adopted and acted upon Mr. Corcoran's letter of July 16, 2019, by thus moving for an 'emergency take-over' of the charter" of LMA, it allegedly "acted upon a legal mandate which did not exist—a legal mandate that Mr. Hundley not be allowed to work as an administrator for a [c]harter [s]chool." *Id.* at ¶38.

### iv.   *Termination of LMA's Charter*

On July 23, 2019, SBMC held a meeting and voted on whether to terminate LMA's charter. *Id.* at ¶40. As explained above, the City's utility billing customer service supervisor had emailed a copy of the July 22, 2019 shut-off notice to Saunders the day before. *Id.* at ¶39; Doc. 108 at 138. At the meeting, SBMC "voted to terminate the charter school contract" between SBMC and LMA. Doc. 108 ¶40. SBMC explained that the termination resulted from the immediate, serious danger to the

health, safety, or welfare of the students in material violation of law based upon "two major factors." *Id.* First, Hundley remained as LMA's chief executive officer, even though he posed a danger to the health, safety, or welfare of students due to actions that resulted in the revocation of his educator's certificate for five years under Florida Statutes § 1012.795 and the requirement that he not be employed in a capacity requiring direct contact with students. *Id.* Second, LMA's fiscal management presented an immediate and serious danger to the health, safety, or welfare of the students, "which violated both the Contract and the law . . . [including] as well as the administrative and fiscal management of LMA, which led to dire circumstances, including: 1) A water "Shut-Off Notification dated July 22, 2019, due to the inability to pay the utility bill . . . ." *Id.* (internal alterations in original).

### v.  *Suspension and Termination of Scott, Phillips, Ross, and Enrisma*

Scott, Phillips, Ross, and Enrisma are African-American women. *Id.* at ¶¶109, 124, 139, 146. After the vote to terminate LMA's charter, Scott, Phillips, Ross, and Enrisma were suspended, terminated, or placed on administrative leave pending investigation. *Id.* at ¶20(F). The School District allegedly terminated Scott, Phillips, Ross, and Enrisma "under circumstances that give rise to a reasonable inference that the said suspension[s] and terminations were acts of retaliation and reprisal against them for opposing racial discrimination in education within the School District." *Id.* at ¶43.

### 1. <u>Scott</u>

Beginning with Scott, after the School District's "take-over" of LMA, the School District targeted her because of her proactive involvement in support of LMA's mission to improve the provision of public school education to underprivileged, inner-city, African-American youth." *Id.* at ¶111. The School District also targeted Scott because she was a key administrator at LMA and her skill-sets were essential to the administration of LMA's innovative curriculum and for enabling it to achieve that mission. *Id.* at ¶111(G). Following the "take-over," Scott's salary was reduced without reason, her title was changed from "executive program director" to "behavior support specialist," and Acting Principal Ronnie King refused to work with her. *Id.* at ¶111(F).

On August 23, 2019, Scott assisted students in participating a protest and demonstration, which the Manatee Concerned Citizens for Justice ("MCC4J") had organized, held near LMA's campus. *Id.* at ¶111(G). Specifically, she led students through the school to where King was standing. *Id.* When King asked for the names of students who insisted on going outside to observe the demonstration, some students walked past King without providing their names. *Id.* Scott followed the students to the door to watch the students walk to the fence where the demonstration was being held. *Id.* Having observed Scott assist these students, King informed Scott that she was "in trouble." *Id.* On the same day, she was placed on administrative leave pending investigation. *Id.* She filed an EEOC charge of discrimination "immediately following" her suspension "on or about August 23, 2019." Doc. 108-1 at 88. On

October 3, 2019, the School Board's administrator informed her that she was terminated. *Id.* An investigator told her that she "was perceived to have helped plan the Parent/Teacher Protest." Doc. 108-1 at 89. She contends that the EEOC charge "was a primary cause or contributing factor" to her termination. *Id.* at 88.

### 2. Phillips

After the School District's "take-over," Phillips, whom LMA hired as a computer technician, helped with organizing the protest through MCC4J. Doc. 108 ¶¶125, 125(C), 136. On August 23, 2019, she helped students walk out of the building to attend the protest of the "take-over" as "being racially discriminatory and designed to prevent African Americans from receiving a quality public-school education." *Id.* at ¶125(D). King or an SBMC executive told her that she was "in trouble" when she opened the door to let several students out of the building. She was placed on unpaid leave on the same day. She was terminated from her employment with LMA on August 26, 2019. *Id.* at ¶125(E). The School District allegedly targeted Phillips because of her proactive involvement in support of LMA, which resulted in her termination. *Id.* at ¶126. The basis for her termination was that she was still within her 90-day probation period, but this reason was allegedly pretext "for taking the retaliation action." Doc. 108-1 at 93.

### 3. Ross

A teacher at LMA, Ross joined the MCC4J and supported its demonstration near LMA's campus on August 23, 2019. Doc. 108 ¶¶139(B), 140(C). She assisted several students with leaving the school and attending the demonstration, the sole

objective of which was to "protest the take-over of [LMA] by the Manatee County School District, on the basis that it was racially discriminatory." *Id.* at ¶140(D). The School District targeted Ross because of her support of LMA and the students who wished to participate in the demonstration, which resulted in "the termination of [her] employment with LMA [and/or] her removal from her position with LMA." *Id.* at ¶141. She was suspended and placed on administrative leave on August 23, 2019. *Id.* at ¶141(A). She was terminated on October 4, 2019. *Id.* at ¶141(B). She contends that she received "no clear reason for [her] termination, other than Florida law governing school charters permitted the School District to terminate" her. Doc. 108-1 at 95. But she believes this reason was pretext for retaliation. *Id.*

#### 4. Enrisma

Hundley hired Enrisma as a food services manager at LMA for the 2018-2019 school year. Doc. 108 ¶146(B). She joined MCC4J to "support the efforts to redress systematic racial discrimination" at LMA and the School District of Manatee County. *Id.* at ¶146(D). During the day of the protest, she walked with her children from LMA to the demonstration. *Id.* at ¶147(E). When King asked her where she and the children were going, she informed him that she was giving them permission to walk out. *Id.* She was suspended for insubordination and placed on administrative leave on August 23, 2019. *Id.* at ¶148(A). She was terminated on October 3, 2019. *Id.* at ¶148(B).

## C. Claims

The Second Amended Complaint brings these claims: (1) LMA's "claim against Defendant School District of Manatee County for the unlawful termination of contract by School District" (Count I); (2) LMA's "'tort' claim against the Defendant City of Palmetto for foreseeable damages caused therefrom for interference with third party contract" (Count II); (3) LMA's "'tort' claim against the Florida Department of Education and Commissioner of Education . . . Richard Corcoran" (Count III); (4) Hundley's "'tort' claim against the Florida Department of Education and Commissioner of Education . . . Richard Corcoran" (Count IV); (5) Hundley's "claim against the School District of Manatee County for Disparate Treatment in the Terms, Conditions, and Privileges of Employment" (Count V); (6) Scott's "retaliatory discharge claim against the School District of Manatee County pursuant to Title VII of the 1964 Civil Rights Act" (Count VI); (7) Scott's "retaliatory discharge by the School District of Manatee County was a part of a pattern, practice, custom and usage of racial discrimination within the public schools of Manatee County, in violation of the Thirteenth Amendment and the Civil Rights Act of 1866 and 1871 (42 U.S.C. § 1983)" (Count VII); (8) Phillips's "retaliatory discharge claim against the School District of Manatee County pursuant to Title VII of the 1964 Civil Rights Act and the Thirteenth Amendment" (Count VIII); (9) Phillips's "retaliatory discharge by the School District of Manatee County was a part of a pattern, practice, custom and usage of racial discrimination within the public schools of Manatee County, in violation of the Thirteenth Amendment and the Civil Rights Act of 1866 and 1871 (42 U.S.C. §

1983)" (Count IX); (10) Ross's "retaliatory discharge by the School District of Manatee County was part of a pattern, practice, custom and usage of racial discrimination within the public schools of Manatee County, in violation of the Thirteenth Amendment and the Civil Rights Act of 1866 and 1871 (42 U.S.C. § 1983)" (Count X); and Enrisma's "retaliatory discharge claim against the School District of Manatee County pursuant to 42 U.S.C. §§ 1981(c), 1988; Civil Rights Act of 1866 and the Thirteent[h] Amendment, U.S. Constitution" (Count XI). Doc. 108 ¶¶ 44–151.

## II.   DISCUSSION

### A. Motion for Judicial Notice of Certain Adjudicative Facts Contained in the Court Record (Doc. 296)

Plaintiffs ask the Court to judicially notice these documents, all of which have been filed in this action:

- A summons addressed to "Commissioner, Florida Department of Education (State of Florida) ATTN: Richard Corcoran, Commission" (Doc. 7);

- A letter from Plaintiffs' counsel to the Department's counsel, attached to the "Motion for Reconsideration: Objection to Order of Dismissal and Motion to Vacate") (Doc. 282-10);

- A July 24, 2019 letter entitled "Notice of Immediate Termination Pursuant to Florida Statute Sections 1002.33(8)(a)(2), 1002.33(8)(a)(3), 1002.33(8)(a)(4), and 1002.33(8)(c)," attached to LMA and Hundley's "Motion for Summary Judgment Against the Florida Department of Education" (Doc. 244-3);

- An August 23, 2019 letter entitled "Forensic Investigation of Lincoln Memorial Academy – As of August 23, 2019," attached to LMA and Hundley's "Motion for Summary Judgment Against the Florida Department of Education" (Doc. 244-4)

- The School District of Manatee County Policy Manual and an accompanying document entitled "Board Material – October 22, 2019," attached to Ross's "Motion for Summary Judgment Against the School District of Manatee County," Enrisma's "Motion for Summary Judgment Against the School District of Manatee County," Scott's "Motion for Summary Judgment Against the School District of Manatee County" (Docs. 222-6, 223-6, 224-6);

- The School District of Manatee County Policy Manual and an accompanying document entitled "Board Material – September 10, 2019," attached to Phillips's "Motion for Summary Judgment Against the School District of Manatee County" (Doc. 225-6);

- The "Witness Affidavit of Rodney K. Jones," attached to Ross's "Motion for Summary Judgment Against the School District of Manatee County," Enrisma's "Motion for Summary Judgment Against the School District of Manatee County," Scott's "Motion for Summary Judgment Against the School District of Manatee County," and Phillips's "Motion for Summary Judgment Against the School District of Manatee County" (Docs. 222-2, 223-2, 224-2, 225-2);

- The "Sworn Finance and Accounting Statement of Lincoln Memorial Academy Founder and Chief Executive Officer Eddie C. Hundley," which is attached to Ross's "Motion for Summary Judgment Against the School District of Manatee County," Enrisma's "Motion for Summary Judgment Against the School District of Manatee County," Scott's "Motion for Summary Judgment Against the School District of Manatee County," and Phillips's "Motion for Summary Judgment Against the School District of Manatee County" (Docs. 222-3, 223-3, 224-3, 225-3);

- The "Sworn Statement of Christine Dawson," attached to LMA's "Motion for Summary Judgment Against the School District of Manatee County" (Doc. 246-10);

- The "Sworn Statement of Cornelle Maxfield," attached to LMA's "Motion for Summary Judgment Against the School District of Manatee County" (Doc. 246-11);

- The "Witness Affidavit of Eddie Hundley" and the "Sworn Finance and Accounting Statement of Lincoln Memorial Academy Founder and Chief Executive Officer Eddie C. Hundley," attached to LMA's "Motion for Summary Judgment Against the School District of Manatee County" (Docs. 246-8, 246-9);

18

- The "Sworn Statement of Christopher John Czaia," attached to "Plaintiffs' Response in Opposition to the Defendant City of Palmetto's Motion to Dismiss Second Amended Complaint" (Doc. 152-3);

- The "Witness Affidavit of Charlie Kennedy," attached to "Plaintiffs' Response in Opposition to the Defendant City of Palmetto's Motion to Dismiss Second Amended Complaint" (Doc. 152-1);

- The "Uniform Statement of Undisputed Facts" attached to LMA and Hundley's "Motion for Summary Judgment Against the Florida Department of Education," LMA's "Motion for Summary Judgment Against the City of Palmetto," and LMA's "Motion for Summary Judgment Against the School District of Manatee County" (Docs. 244-1, 245-1, 246-1); and

- Ross's "Motion for Summary Judgment Against the School District of Manatee County," Enrisma's "Motion for Summary Judgment Against the School District of Manatee County," Scott's "Motion for Summary Judgment Against the School District of Manatee County," Phillips's "Motion for Summary Judgment Against the School District of Manatee County," LMA and Hundley's "Motion for Summary Judgment Against the Florida Department of Education," LMA's "Motion for Summary Judgment Against the City of Palmetto," LMA's "Motion for Summary Judgment Against the School District of Manatee County" (Docs. 222, 223, 224, 225, 244, 245, 246).

At any stage of the proceeding, the Court may take judicial notice of a fact that is not subject to reasonable dispute because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2), (d). Thus, in ruling on a motion to dismiss, the Court may consider matters of which the Court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Among such items are court records, as they are not subject to reasonable dispute. *Griffin v. Verizon Comm'cns Inc.*, 746 F. App'x 873,

876 (11th Cir. 2018).[6] The Court may consider those documents only to the extent that they speak for themselves and not for the truth of the matters asserted. *Mathieson v. Wells Fargo Bank, NA as Tr. for Pooling & Servicing Agreement Dated as of June 1, 2006 Securitized Asset Backed Receivables LLC Tr. 2006-FR2 Mortg. Pass-Through Certificates, Series 2006-FR2*, 524 F. Supp. 3d 1246, 1256 n.10 (M.D. Fla. 2021); *see Thomas v. Waste Pro USA, Inc.*, No. 8:17-cv-2254-CEH-CPT, 2019 WL 3835255, at *2 (M.D. Fla. Aug. 15, 2019) ("[T]he court may take judicial notice of the documents filed in a proceeding, but not the facts contained in the documents.").

Although titled as a motion for judicial notice, the motion extends beyond a standard request for judicial notice. Plaintiffs argue that the Court "must vacate its ruling in the Rule 12(b)(6) motion hearing . . . which improperly divested the LMA Plaintiffs [of] their right to judicial notice [of] various public court records in this case." Doc. 296 at 3. Plaintiffs argue that the Court held that it could not consider documents outside of the four corners of the Second Amended Complaint, which "denied them a fair opportunity to interpose any discussion of other documents in the public court record of this case, violated the law of judicial notice," and prohibited them "from meaningful court access" and "from enjoying their federal statutory right to present evidence" during oral argument. *Id.* at 6.

First, as explained in more detail below, any request to vacate that Court's oral ruling is improper. The Court stated during oral argument that although it was

---

[6] Unpublished decisions of the Eleventh Circuit are not binding precedent, but may be cited as persuasive authority. 11th Cir. R. 36-2.

granting the Department's motion to dismiss by oral order, counsel should rely upon a subsequent written order. But Plaintiffs do not ask the Court to vacate its written order. Indeed, they cannot do so because the Court had not issued a written order when they filed their motion.[7] Thus, the request for the Court to vacate its oral order of dismissal is denied.

Next, in asking the Court to take judicial notice, they rely upon *Swierkiewicz v. Sorema N.A.*, 5344 U.S. 506 (2002), to argue that the Court must consider the documents attached to their motions for summary judgment and "similar public court documents."[8] *Id.* at 8–9. They also rely upon that case to argue that they "preserve their procedural rights" to "have their pre-trial discovery documents explain and (or) supplement the Second Amended Complaint in rebuttal . . . to the Defendants' several

---

[7] Plaintiffs also inaccurately characterize the Court's statement during oral argument. During oral argument, Plaintiffs cited to non-binding authority to argue that the Court can consider items in the record and that since Plaintiffs had filed motions for summary judgment, those motions "clearly flesh[] out for the Court's understanding what the plaintiffs intend or what the plaintiffs mean." Doc. 298 at 14:21–25, 15:1–3. Those items in the record, Plaintiffs argued, "answer the question [of] whether or not this case should be dismissed." *Id.* at 15:4–8. Plaintiffs also argued that to the extent the Second Amended Complaint is "somewhat fuzzy about" about whether Eleventh Amendment immunity applies, the motions for summary judgment "clearly clarif[y] it" and "make[] an argument that [the Second Amended] Complaint can't be amended totally untenable." *Id.* at 16:25, 17:1–6. In response to this argument, the Court stated, "[T]he law is quite clear that on a motion to dismiss, the Court is limited to the four corners of the [Second Amended] Complaint, attachments thereto, [and] things that can be judicially noticed." *Id.* at 17:15–19. Thus, the Court explicitly recognized that it could consider matters of which it could take judicial notice.

[8] They also rely upon this sentence from *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*: "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling upon Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." 551 U.S. 308, 322 (2007).

motions to dismiss." *Id.* at 9. But this argument invites the Court to assume the truth of the matters asserted in those documents in order to "explain" or "supplement" the Second Amended Complaint, which the Court cannot do.

Further, *Swierkiewicz* does not stand for the offered proposition. There, the issue before the Court was "whether a complaint in an employment discrimination lawsuit must contain specific facts establishing a prima facie case of discrimination" under the *McDonnell-Douglas* burden-shifting framework. 534 U.S. at 508.  Recognizing that the *McDonnell-Douglas* prima facie standard is an evidentiary standard, not a pleading standard, the Court held that "an employment discrimination plaintiff need not plead a prima facie case of discrimination." *Id.* at 510, 515. The Court recognized that the prima facie standard "should not be transposed into a rigid pleading standard for discrimination cases." *Id.* at 512. The Court also recognized that the "simplified notice pleading standard," as articulated in *Conley v. Gibson*, 355 U.S. 41 (1957), "relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims" and that "attempted surprise in federal practice is aborted very easily" as a result of flexible discovery provisions and effective provisions for pretrial procedure and summary judgment. *Id.* at 512–13.

Thus, *Swierkiewicz* addressed the pleading standard for an employment-discrimination plaintiff. The case never mentions judicial notice. Although it "had no impact" on the statement that a plaintiff need not plead a prima facie case of discrimination in order to survive dismissal of such a claim, "*Twombly* effectively

overruled *Swierkiewicz* when it rejected the old standard for dismissal set out in *Conley v. Gibson*." *McCone v. Pitney Bowes, Inc.*, 582 F. App'x 798, 801 n.4 (11th Cir. 2014). *See McCullough v. Bd. of Regents of the Univ. Sys. of Ga.*, 623 F. App'x 980, 983 (11th Cir. 2015) ("McCullough's reliance on *Swierkiewicz* is unavailing. Even if a plaintiff need not plead a prima facie case to survive dismissal, the complaint must satisfy *Iqbal*'s 'plausible on its face' standard, and the allegations must be sufficient to 'raise a right to relief above the speculative level' under *Twombly*."). Because Plaintiffs' reliance upon *Swierkiewicz* is misplaced, their requests for the Court to judicially notice certain documents "to establish the fact that, for the purpose of Rule 12(b)(6), all of [them] have engaged in further and meaningful discovery for the express purpose of further developing their claims for relief and legal theories as per the holding in *Swierkiewicz*" also lack support. As such, the Court declines to judicially notice any of the documents for that purpose.

Examining other bases for Plaintiffs' requests for judicial notice reveals improper grounds. For example, in asking the Court to take judicial notice of a policy manual and accompanying minutes purportedly documenting Ross's termination, Plaintiffs argue that the document "contracts [sic] the School Board's contention that the Plaintiff was not an employee of the School District of Manatee County." Doc. 296 at 15. This argument improperly asks the Court to take judicial notice of the truth of the matters asserted in that document, which the Court declines to do. As another example, in asking the Court to judicially notice a summons and a letter from Plaintiffs' counsel to the Department's counsel, Plaintiffs state that the real party in

interest in Count III is the Department "with the Commissioner of Education Richard Corcoran acting in his official capacity and as the senior policy-making official of that department." *Id.* at 12–13. To the extent that Plaintiffs asks the Court to take judicial notice of any document for that purpose, the Court declines to do so.

In considering the pending motions to dismiss, the Court will take judicial notice of the documents to which Plaintiffs point only for the purpose of judicially noticing that Plaintiffs have filed those documents. The Court will not take judicial notice of the documents for any other purpose, including for the truth of the matters asserted therein or the facts in those documents. *See Mathieson*, 524 F. Supp. 3d at 1256 n.10; *Thomas*, 2019 WL 3835255, at \*2. The Court will not consider the substance of these documents when ruling on the motions to dismiss. All other requested relief in the Motion for Judicial Notice will be denied.

### B. Motion to Substitute/Motion to Join Commissioner of Education Richard Corcoran as a Party Defendant Pursuant to Rules 15 and 21 of the Federal Rules of Civil Procedure (Doc. 288)

LMA and Hundley filed their "Motion to Substitute/Motion to Join Commissioner of Education Richard Corcoran as a Party Defendant Pursuant to Rules 15 and 21 of the Federal Rules of Civil Procedure" after the Court held oral argument on the motions to dismiss (Doc. 288). LMA and Hundley "seek to correct a 'misnomer' to the naming of Defendant 'State of Florida, Florida Department of Education.'" Doc. 288 at 3. They contend that "the correctly named Defendants shall be: 'Richard Corcoran Individually and in His Official Capacity as Commissioner of the Florida Department of Education and the Florida Department of Education.'" *Id.*

(original emphasis removed). They assert that this "amendment" is appropriate under Rule 15(a)(2), Rule 20(a)(2), and Rule 21 of the Federal Rules of Civil Procedure. *Id.* They "seek leave to file an [a]mended [c]omplaint consistent with" this requested relief. *Id.* at 6. For the reasons set forth below, the Court will deny this motion.

Despite LMA and Hundley offering a variety of labels and citing several rules, the Court construes this motion as requesting leave to amend the Second Amended Complaint under Rule 15. They explicitly ask the Court for leave to amend. They discuss the propriety of their "amendment" several times. As discussed below, the two cases upon which they rely address Rule 15(c), which addresses relation back of amendments. *See* Fed. R. Civ. P. 15(c). Further, although they claim that they simply seek to "substitute" the name of Commissioner Corcoran for the Department, they seek to name Corcoran, in his individual and official capacities, and the Department as defendants. Thus, their request extends beyond mere substitution.[9] Similarly, they point to Rule 21, which addresses misjoinder, *see* Fed. R. Civ. P. 21. "Misjoinder occurs when parties fail to satisfy Federal Rule of Civil Procedure 20(a)." *Travelers Indem. Co. of Ct. v. Attorneys Title Ins. Fund, Inc.*, No. 2:13-cv-670-SPC-DNF, 2013 WL 6768216, at *1 (M.D. Fla. Dec. 19, 2013). But it is not clear (nor is it argued) how LMA and Hundley failed to comply with Rule 20(a) in naming the Department. *See* Fed. R. Civ. P. 20(a)(2). As such, the Court construes the motion as requesting leave

---

[9] Further, Rules 17 and 25 discuss substitution of a party. *See* Fed. R. Civ. P. 17; Fed. R. Civ. P. 25. LMA and Hundley do not present any cogent argument for proceeding under those rules.

to file an amended complaint to name both Corcoran, in his individual and official capacities, and the Department as defendants.

The two cases to which they cite are also distinguishable. First, they point to *Kirk v. Cronvich*, 629 F.2d 404 (5th Cir. 1980),[10] *abrogated in part by Schiavone v. Fortune*, 477 U.S. 21 (1986).[11] The only issue before the court in *Kirk* was whether a statute of limitations barred a claim that named a sheriff individually and in his official capacity. 629 F.2d at 405–06. The appellant's original complaint named a parish and the parish sheriff's office. *Id.* at 405. After the district court dismissed the original complaint as to the sheriff's office on the ground that the sheriff's office was not an entity capable of being sued, the appellant "amended her complaint by substituting" the sheriff, in his individual and official capacities. *Id.* The district court dismissed the complaint as to the sheriff because a statute of limitations barred it. *Id.* On appeal, the appellant argued that the amended complaint, which added the sheriff, was timely because it related back to the time of filing of the original complaint under Rule 15(c). *Id.* at 406–07. Analyzing Rule 15(c), the Court held that "any prescriptive period possibly applicable" did not bar the amended complaint since that pleading related back to the time of the filing of the initial complaint. *Id.* at 407–09.

---

[10] In *Bonner v. City of Prichard*, the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[11] *Schiavone* rejected the holding in *Kirk* that "the period for notice includes a reasonable time to perfect service." *Honeycutt v. Long*, 861 F.2d 1346, 1352 n.9 (5th Cir. 1988).

Relying upon *Kirk*, LMA and Hundley argue that "[w]henever a [d]efendant is substituted or joined, in order to correct a name-change, or name clarification, the amended pleading relates back to the date of the filing of the original complaint." Doc. 288 at 3–4. But the plain language of Rule 15(c)(1)(C) does not support this proposition. *See* Fed. R. Civ. P. 15(c)(1)(C). In *Kirk*, the court conducted an analysis of the requirements of Rule 15(c)(1)(C). LMA and Hundley do not provide any analysis of those requirements. Instead, they latch onto the *Kirk* court's recognition that the first requirement was met because the amended complaint substituted the name of the sheriff for the sheriff's office to argue that, like *Kirk*, they "have sought simply to change the 'name' of the Defendant. Doc. 288 at 4, 6. Rule 15 demands more. Further, LMA and Hundley do not simply seek to "change the 'name' of the Defendant." As highlighted above, they seek to sue Corcoran in his individual and official capacities while also naming the Department of Education. And while suing the Commissioner of Education in an official capacity "is in reality a suit against the Florida Department of Education," *id.* at 6, this argument ignores LMA and Hundley's request to add Corcoran in his individual capacity, which is not equivalent to a suit against the Department.

The other case upon which LMA and Hundley rely—*Bayer v. United States Department of the Treasury*, 956 F.2d 330 (D.C. Cir. 1992)—does not support their position, either. There, the court rejected the appellee's argument that because the appellant named the Department of the Treasury, rather than the Secretary, as the defendant, subject-matter jurisdiction was lacking. 956 F.2d at 334. The court

explained that the then-recent amendment to Rule 15(c) disposed of "this misnomer argument" because "the alteration relates back to the date of the original pleading." *Id.* To that end, the court explained that "[c]hanging the designation of defendant from 'Department' to 'Secretary'" was "just and practicable." *Id.* at 334–35. This recognition does not excuse any compliance with the requirements of Rule 15(c)(1)(C). LMA and Hundley simply point to this language from *Bayer* and, as with their argument for *Kirk*, deem the case "analogous"; they do not provide any analysis of the requirements of Rule 15(c)(1)(C). Doc. 288 at 5–6. Also, their request does not constitute an effort to correct a misnomer or a mere designation. Again, they seek to name both the Department and Corcoran, in his individual and official capacities, as defendants—quite different from the designation change in *Bayer*. Thus, the cases upon which LMA and Hundley rely are distinguishable.

Additionally, allowing LMA and Hundley to amend the Second Amended Complaint would require amending the CMSO's deadline to amend the pleadings. The Case Management and Scheduling Order's deadline to amend the pleadings— August 14, 2020—passed a long time ago.[12] Doc. 29 at 2. Federal Rules of Civil

---

[12] In September of 2020, Plaintiffs requested an extension of that deadline (Doc. 53). Contemporaneous with the Court's dismissal of the First Amended Complaint as a shotgun pleading and *sua sponte* provision of leave to file an amended pleading (Doc. 96), the Court denied that motion. Doc. 97. The Court noted that any party thereafter seeking an extension of a CMSO deadline could move for such relief. *Id.* The Court later granted (Doc. 129) SBMC's and the Department's unopposed motions for extensions of CMSO deadlines, neither of which sought an extension of the deadline to amend the pleadings (Docs. 111, 128). In January of 2021, Plaintiffs moved for leave to file a third amended complaint (Doc. 159), but they withdrew that motion (Docs. 241, 271).

Procedure 15 and 16 guide the determination of whether to allow an untimely amendment to the pleadings. *Johnson v. R.J. Reynolds Tobacco Co.*, No. 2:12-cv-618-FtM-29UAM, 2013 WL 38922991, at *2 (M.D. Fla. July 26, 2013). Rule 16(b)(4) states that a "schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "This good cause standard precludes modification unless the schedule cannot be met despite the diligence of the party seeking the extension." *Sosa v. Airprint Sys. Inc.*, 133 F.3d 1417, 1418 (11th Cir. 1998) (internal quotation marks omitted). "Only after finding good cause exists to modify the schedule will the court proceed to determine whether amendment to the pleading is proper." *Johnson*, 2013 WL 3892991, at *2.

LMA and Hundley fail to offer a persuasive reason for their proposed late amendment. They contend that they "elected to await a ruling" on the Department's motion to dismiss before filing this motion in the interest of preserving time and resources and that "[i]t was then determined"—they fail to specify by whom—"that a denial of the [Department's] Motion to Dismiss would have rendered 'moot' any pending Motion to Substitute/Motion to Join." Doc. 288 at 2. They contend that the Court has delayed ruling on the motion to dismiss and that the motion is timely because it followed the Court's oral order granting the motion to dismiss. *Id.* These arguments fail to demonstrate good cause or excusable neglect for the tardy request. The argument that LMA and Hundley elected to await a ruling on the Department's motion to dismiss underscores a lack of diligence and ignores that the CMSO's deadline to amend the pleadings had already passed when the Department filed the

motion to dismiss. LMA and Hundley fail to explain why a denial of the Department's motion to dismiss would render any pending request to "substitute" or "join" moot. LMA and Hundley's decision to file this motion after the Court's oral ruling does not render the motion timely, regardless of any delays in ruling on the Motion to Dismiss. The CMSO determines the timeliness of a request to amend the pleadings, not an oral order on a motion to dismiss.

Therefore, based on the foregoing analysis, the Court will deny this motion.

### C. Shotgun Pleading

SBMC and the City argue in their motions to dismiss that the 237-page Second Amended Complaint constitutes a shotgun pleading. Doc. 118 at 9–11; Doc. 119 at 12–15. Both SBMC and the City argue that the Court should dismiss the Second Amended Complaint with prejudice because Plaintiffs, despite receiving an opportunity to amend to cure shotgun-pleading deficiencies, failed to cure the deficiencies. Doc. 118 at 10; Doc. 119 at 13. The Court addresses this issue first, and separately from the other arguments in the motions to dismiss, because even if the Second Amended Complaint constitutes a shotgun pleading, the Court will endeavor to resolve the motions on the merits, rather than "non-merits shotgun pleading grounds." *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1296 (11th Cir. 2018). For the reasons set forth below, the Second Amended Complaint constitutes a shotgun pleading.

First, a bit of procedural history. When the Court dismissed the 96-page First Amended Complaint, it defined shotgun pleadings and identified numerous shotgun-

pleading deficiencies in that pleading. The Court explained that the nature of Plaintiffs' pleading foreclosed any understanding of the entities against whom they brought the claims. Doc. 96 at 3. For example, although Count I appeared to be a claim by LMA against SBMC, the claim requested judgment against "Defendants" for compensatory and punitive damages. *Id.* at 3–4. As another example, one claim's label indicated only that Hundley brought the claim (but not whom he brought the claim against), the body of the claim mentioned the SBMC's "targeting" of him in the body of the count, and the claim concluded by demanding judgment against "Defendants." *Id.* at 4. As a result, the Court was "forced to speculate as to the entity against whom the claim [was] brought." *Id.*

Whether Plaintiffs combined claims within counts was also unclear. By way of example, Counts IV, V, VI, and VII stated that SBMC violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1983. *Id.* at 5. The Court could not determine whether Plaintiffs brought separate Title VII claims or instead sought to offer allegations pertaining to Title VII in support of their § 1983 claims. *Id.* at 5. The Court emphasized that if certain counts included multiple claims, the failure to separate those claims into separate counts rendered the First Amended Complaint a shotgun pleading. *Id.*

Thus, the Court dismissed the First Amended Complaint and *sua sponte* provided Plaintiffs with leave to amend so that they could correct the shotgun-pleading deficiencies. *Id.* at 6. The Court advised that it would "permit Plaintiffs one—and only one—opportunity to cure the shotgun pleading deficiencies" in the First Amended

Complaint. *Id.* Eleventh Circuit precedent supports that admonition. *See Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1358 (11th Cir. 2018) ("In dismissing a shotgun complaint for noncompliance with Rule 8(a), a district court must give the plaintiff 'one chance to remedy such deficiencies.'"). The Court also advised that any amended pleading needed to correct the discussed deficiencies. Doc. 96 at 6.

As previously explained, complaints that violate Rule 8(a)(2) or Rule 10(b) are often referred to as "shotgun pleadings." *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1320 (11th Cir. 2015). The Eleventh Circuit has identified four general types of shotgun pleadings. *Id.* at 1322–23. A complaint which asserts "multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against," constitutes one type. *Id.* at 1323. Another type is a complaint that "commits the sin of not separating into a different count each cause of action or claim for relief." *Id.* at 1322–33. Ultimately, "[t]he unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* Shotgun pleadings "waste scarce judicial resources, inexorably broaden the scope of discovery, wreak havoc on appellate court dockets, and undermine the public's respect for the courts." *Vibe Micro*, 878 F.3d at 1295 (internal alterations and quotation marks omitted). "As drafters of their pleadings and officers of the court, lawyers in this circuit bear a responsibility to preserve the limited

resources of the judiciary and present only clear, precise pleadings to the courts." *Barmapov v. Amuial*, 986 F.3d 1321, 1328 (11th Cir. 2021) (Tjoflat, J., concurring).

Unfortunately, the shotgun-pleading deficiencies from the First Amended Complaint remain in the Second Amended Complaint. Two primary deficiencies remain: (1) Plaintiffs seem to combine claims within counts; and (2) the Second Amended Complaint still presents difficulty in determining the parties against whom Plaintiffs lodge claims. These deficiencies have made it more difficult for the Court and Defendants to analyze the claims brought by plaintiffs.

### i. Combining Claims

First, the most glaring shotgun-pleading deficiency with the Second Amended Complaint is the continued failure to define and to separate claims. Before examining the claims, the Court looks to Plaintiffs' initial efforts to frame those claims. Initially, Plaintiffs allege that this action arises under Sections 1 and 2 of the Thirteenth Amendment to the United States Constitution, "as implemented by (a) Title VII of the 1964 Civil Rights Act; [(b)] the Civil Rights Act of 1866 (42 U.S.C. §§ 1981(c); and [(c)] the Civil Rights Act of 1871 (42 U.S.C. § 1983 ('Deprivation of Civil Rights Under Color of Law')." Doc. 108 ¶2. They also allege that the Title VII "legal theories" upon which Scott and Phillips premise their claims are retaliation and racial discrimination, "which are also based upon Defendants' civil liability under 42 U.S.C. [§] 1983" and that the legal theories for § 1983—upon which the action is premised—are racial discrimination, racial harassment, and retaliation." *Id.* at ¶10.

According to Paragraph 15, *each* Plaintiff: (1) alleges that Defendants, "with varying degrees of culpability," have deprived them of "their rights to 'make and enforce contracts,' and that each of the Defendants did so 'under color of law,'" and in violation of the Thirteenth Amendment to the United States, as "implemented by" Title VII "and (or)" 42 U.S.C. § 1981(c)); (2) asserts their claims under 42 U.S.C. § 1981(c); (3) asserts their claims under 42 U.S.C. § 1983; and (4) asserts their claims "directly" under Sections 1 and 2 of the Thirteenth Amendment. *Id.* at ¶¶15–15(B), 15(D). They also allege that Scott, Phillips, Ross, and Enrisma assert their claims under the section of Title VII that addresses discrimination with respect to the terms, conditions, or privileges of employment. *Id.* at ¶15(C) (quoting 42 U.S.C. § 2000e-2(a)).[13]

Armed with these contextual allegations, the Court examines some of the claims. The Second Amended Complaint labels Count III as "'Tort' Claim" by LMA "against the Florida Department of Education and Commissioner of Education . . . Richard Corcoran." Doc. 108 at 31. This label, by itself, indicates that LMA sues for the alleged commission of a tort. Indeed, within the claim, LMA alleges that Corcoran's letters "constituted the tort of libel" because they were "against Hundley" and "were untruthful and scandalous in nature." *Id.* at ¶72. LMA also alleges that

---

[13] In their response to SBMC's motion to dismiss, Plaintiffs represent that Paragraph 15(C) "mistake[nly]" alleges that these plaintiffs bring their claims under Title VII, as "[o]nly Scott and Phillips have filed claims under Title VII." Doc. 150 at 19 n.21. The Second Amended Complaint still constitutes a shotgun pleading even when accepting this correction.

Corcoran's letters falsely asserted that Hundley could not work near children and that the Department "could reasonably foresee the consequences of its "torutuous [sic], libelous and defamatory actions." *Id.* at ¶¶73, 73(B).

Despite allegations describing this claim as involving the "tort of libel," which would indicate a state-law claim, the count also references the United States Constitution and two federal statutes: 42 U.S.C. §§ 1981 and 1983. The label for this claim—like the labels for many other claims in the Second Amended Complaint—includes a footnote, which states: "Pursuant to 13th Amend., U.S. Const., 42 U.S.C. § 1981(c) ('Make and Enforce Contracts'); 14th Amend., U.S. Const., 42 U.S.C. § 1983 ('Deprivation of Civil Rights')." *Id.* at 31 n.45. Within the claim, LMA alleges that the Department violated Hundley's right to "make and enforce contracts" with the School District of Manatee County and that the Department "acted through" Corcoran, "who is a policy-maker as per 42 U.S.C. § 1983" and "acts under color of State Law." *Id.* at ¶¶70–71 (internal quotation marks omitted).

References to both § 1981 and § 1983 within a count do not necessarily indicate that count combines claims. A plaintiff must bring a § 1981 claim against a state actor under § 1983.[14] "Section 1983 creates a private right of action against persons who,

---

[14] "Congress passed the Civil Rights Act of 1866 in the aftermath of the Civil War to vindicate the rights of former slaves. Section 1 of that statute included the language found codified today in § 1981(a) . . . ." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1015 (2020). The Civil Rights Act of 1991 amended § 1981 by designating the existing text as § 1981(a) and adding two new subsection, including § 1981(c). *Butts v. Cnty. of Volusia*, 222 F.3d 891, 893 (11th Cir. 2000).

35

under color of law, subject a plaintiff to a deprivation of federally-protected rights." *Doe v. Sch. Bd. of Miami-Dade Cnty.*, 403 F. Supp. 3d 1241, 1263 (S.D. Fla. 2019). Section 1983 "constitutes the exclusive remedy against state actors for violations of the rights contained in § 1981." *Butts*, 222 F.3d at 893 (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 731–32 (1989)). In other words, § 1981 does not contain a cause of action against state actors. *Id.* Thus, for example, a plaintiff must bring a § 1981 claim for discrimination or retaliation under § 1983 if she seeks to sue a state actor. *LeCounte v. City of Miami Beach*, 162 F. Supp. 3d 1298, 1301 (S.D. Fla. 2016).

As for the reference to the 13th Amendment, "the weight of authority indicates that the Thirteenth Amendment, by itself, does not provide a cause of action; a plaintiff must proceed under one of the Thirteenth Amendment's implementing statutes." *Gomez v. Kern*, No. 12-20622-Civ, 2012 WL 1069186, at *2 (S.D. Fla. Mar. 29, 2012) (collecting cases). "Section 1981 was passed pursuant to the Thirteenth Amendment." *Smith v. Orange Cnty. Sch. Bd.*, No. 6:04-cv-1811-JA-DAB, 2006 WL 8439525, at *5 n.7 (M.D. Fla. Nov. 29, 2006), *aff'd sub nom.*, *Smith v. Sch. Bd. of Orange Cnty.*, 487 F.3d 1361 (11th Cir. 2007). But the allegations indicate that the Thirteenth Amendment is not cited merely in support of § 1981. As highlighted above, the Second Amended Complaint alleges within a paragraph incorporated into this claim that each plaintiff sues "directly" under the Thirteenth Amendment. The reference to the Fourteenth Amendment further compounds the confusion because whether LMA also seeks to allege a claim under § 1983 for violation of the Fourteenth Amendment, regardless of the merits of such a claim, is unclear. One paragraph incorporated into this claim

alleges that Corcoran violated the rights of Hundley—the allegations in Count III also focus mostly on Hundley, not LMA, despite the label—"to make and enforce contracts and to equal protection of the law and due process of the law in violation of 42 U.S.C. §§ 1983, 1981(c) and the 13th and 14th Amendments, U.S. Constitution." Doc. 108 ¶13.[15] This analysis demonstrates that LMA seemingly brings within Count III a state-law claim for libel, a claim for violation of the Thirteenth Amendment, a claim under § 1983 for violation of § 1981, and possibly a claim under § 1983 for violation of the Fourteenth Amendment.[16]

---

[15] This observation also underscores the confusion inherent in Count IV, which contains nearly identical allegations to Count III, except that Hundley brings that claim. "Employment discrimination claims against state actors for violation of the Equal Protection Clause are cognizable under § 1983, and are subject to the same standards of proof and use the same analytical framework as discrimination claims brought under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981." *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 n.6 (11th Cir. 2018).

[16] Although the Court should not need to look to LMA and Hundley's response to clarify the claims, that response does not offer much clarity. LMA and Hundley argue that they do not bring Counts III or IV under § 1983 or the Fourteenth Amendment, despite the allegations referencing that authority, but that those claims "are grounded in Section 1 of the Thirteenth Amendment" and "Section[s] 1 and 3 of the Civil Rights Act of 1866." Doc. 113 at 1, 4–5. However, during oral argument, Plaintiffs' counsel referenced these claims in the context of § 1983, Doc. 298 at 9:4–6, 11:9–11, and another response indicates that each claim under § 1981(c) "are the exact same claims as claims filed under 42 U.S.C. § 1983," Doc. 150 at 24. Regardless, in their response to the Department's motion to dismiss, LMA and Hundley argue that they bring the claims "directly" under the Thirteenth Amendment. *Id.* at 5. At the same time, they "pro[f]fer the plain text of Sections 1 and 3 of the Civil Rights Act of 1866 as the 'legally operative statutory language' [that] actually governs their 'Section 1981 claims' against Defendant FDOE." Doc. 113 at 4 (original emphasis removed). Citing Section 3 of the Civil Rights Act of 1866, which references common law, they then argue that Counts III and IV are "grounded in Florida common law, to wit:" (1) a claim for tortious interference with a contract; and (2) a claim for "defamation/libel". Doc. 113 at 12–13. And, relevant to Count IV, they contend that "FDOE tortiously interfered with Plaintiff Hundley's right to 'make and enforce contracts in violation of Section 1 of the Civil Rights Act of 1866." *Id.* at 14. Taking these representations as true, Counts III and IV would each appear to bring at least two claims.

As another example, the Second Amended Complaint labels Count VIII as a claim by Phillips for "Retaliatory Discharge" against "the School District of Manatee County Pursuant to Title VII of the 1964 Civil Rights Act and the Thirteenth Amendment." Doc. 108 at 49.  Thus, the label itself indicates that Phillips brings a claim for "retaliatory discharge" under Title VII and the Thirteenth Amendment. Although the label includes a footnote that partially quotes a Fifth Circuit case standing for the proposition that Title VII and § 1981 "more generally arise from the powers granted to Congress by the Thirteenth Amendment," one of the incorporated paragraphs is the allegation that each plaintiff brings claims "directly" under the Thirteenth Amendment. As such, it appears that Phillips intends to bring a claim under Title VII and the Thirteenth Amendment without separating those claims into different counts.[17]

Additionally, the incorporated paragraphs include the allegations that each plaintiff asserts their claims under § 1981(c) and § 1983. A footnote attached to one of these incorporated paragraphs indicates that "[e]ach of the Plaintiffs claims that his or her retaliatory termination violated 42 U.S.C. § 1981," which is asserted in this lawsuit as a claim under § 1983. Doc. 108 at 5 n.3. Indeed, within the claim, Phillips alleges that "[a]s per the allegation[s] in this count, the Defendant School District violated [her] civil rights as per Title VII of the 1964 Civil Rights Act" and "also violated [her]

---

[17] In the response to SBMC's motion to dismiss, Phillips argues that this claim arises under both Section 1 of the Thirteenth Amendment and Title VII of the Civil Rights Act, notwithstanding the references to § 1981 and § 1983 discussed below.

civil rights as per 42 U.S.C. § 1983." Doc. 108 ¶¶128–29. Aside from the footnote on the label of the claim, Phillips does not mention § 1981 in this claim. Where "a plaintiff's claims under Title VII are based on the same set of facts as his claims under § 1983, the analysis under Title VII is identical to the analysis under § 1983." *King v. Butts Cnty.*, 576 F. App'x 923, 931 (11th Cir. 2014) (citing *Abel v. Dubberly*, 210 F.3d 1334, 1338 & n.3 (11th Cir. 2000)); *see also Cross v. State of Ala., State Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490, 1508 (11th Cir. 1995) ("When section 1983 is used as a parallel remedy for violation of [42 U.S.C. § 2000e-2], the elements of the two causes of action are the same."). Because Phillips alleges that this conduct "also" violates § 1983, it appears that she intends to bring a separate claim under § 1983, which she fails to separate into a different count. *Cf. King*, 576 F. App'x at 931 (holding that the analysis for the plaintiff's Title VII claims in Counts I and II applied to his claims under § 1981, which the Court construed as arising under § 1983, in Counts III and IV). Further, although this claim's label and allegations indicate that Phillips bases it upon a "retaliatory discharge," the claim incorporates the paragraph that Phillips brings her claim under the section of Title VII that addresses discrimination with respect to the terms, conditions, or privileges of employment. To the extent that Phillips seeks to bring claims for both discrimination and retaliation under Title VII within this claim, that practice also renders the Second Amended Complaint a shotgun pleading. *Rosado v. Modly*, 3:19-cv-1428-MMH-PDB, 2019 WL 6877184, at *1 (M.D. Fla. Dec. 17, 2019).

Therefore, based on the foregoing reasons and similar deficiencies, the Second Amended Complaint constitutes a shotgun pleading.

### ii. Specifying Defendants

A less severe problem, but a problem nonetheless, is that the Second Amended Complaint still presents difficulty in determining the parties against whom Plaintiffs lodge claims. To be sure, the label for each count in the Second Amended Complaint names the plaintiff who brings the claim and the defendant against whom that plaintiff brings the claim. However, each claim still demands judgment against "Defendants" for compensatory and punitive damages. The Court explicitly highlighted this deficiency in the First Amended Complaint when explaining that the Court could not determine the relevant defendants for each claim. During oral argument, Plaintiffs' counsel stood by the collective references to "Defendants," stating, "[I]t is our position that all of these defendants are jointly and severally liable." Doc. 298 at 65:21–23.[18]

Plaintiff's counsel admitted to intentionally retaining the references, explaining, "[T]he reason[] why we kept the word defendants in there is because we wanted to make sure we preserved our right to claim joint and several liability against the several defendants based upon our entitlement." *Id.* at 69:4–8. An example underscores this problem. When the Court inquired about SBMC's res judicata argument against

---

[18] Plaintiffs' counsel also argued during oral argument that nothing in the order dismissing the First Amended Complaint as a shotgun pleading prevented Plaintiffs from using the word "defendants." Doc. 298 at 65:14–18. While the Court's order did not "prevent" Plaintiffs from using the word "defendants," the order's purpose was to notify Plaintiffs of the shotgun-pleading deficiencies of the First Amended Complaint—deficiencies that, presumably, Plaintiffs would want to fix in repleading.

Count I, which the Second Amended Complaint labels as a claim by LMA against SBMC, Plaintiffs' counsel argued that the res judicata argument must fail because the City was not involved in the other proceeding. *Id.* at 74:16–25,75:1–6. When the Court questioned this argument because Count I does not pertain to the City, Plaintiffs' counsel responded that the City was not involved in Count I, "but, again, you know, that's where the joint and several liability issue comes in . . . ." *Id.* at 75:7–10. Thus, even though the Court highlighted the naming of "Defendants" within each count as a shotgun-pleading deficiency in the earlier order, Plaintiffs intentionally retained this collective reference within each count and advance it to hold the defendants not named within each count jointly and severally liable for the allegations within that count. The result is a situation in which the label for each claim names a defendant and the plaintiff who brings the claim against that defendant, yet each claim also demands judgment against "Defendants" for compensatory and punitive damages, which Plaintiffs ask the Court to interpret as the respective plaintiff bringing that claim against all defendants. As a result, the Court must again speculate as to which defendants are named in each count.[19]

---

[19] Adding more confusion, these collective references fall against a backdrop in which some of the allegations contain numerical inconsistencies. For example, a paragraph within Count VII—a claim by Scott against SBMC—alleges that the "facts and circumstances set forth in averments 65 through 72 thus constitute Thirteenth-Amendment violations of Plaintiff Melvia Scott's rights under 42 U.S.C. § 1981(c) . . . ." Doc. 108 ¶120. But two of these paragraphs, which are within Count III—a claim by LMA against the "Department of Education and Commissioner of Education . . . Richard Corcoran"—pertain to Hundley, not Scott. *Id.* at ¶¶70–71. Count IX, which Phillips brings against SBMC, also references those paragraphs. *Id.* at ¶135.

Plaintiffs, who are represented by counsel, received an opportunity to correct the deficiencies, but they failed to do so.[20] In light of these continued shotgun-pleading deficiencies, the Second Amended Complaint must be dismissed with prejudice. *See Barmapov*, 986 F.3d at 1326 ("Barmapov was represented by counsel, the district court dismissed his first amended complaint after explaining why it was a shotgun pleading, and the court gave him a chance to try again. Barmapov squandered that opportunity by filing another shotgun pleading. Under this circumstance, we have no doubt that the district court did not abuse its discretion" in dismissing with prejudice.); *Jackson*, 898 F.3d at 1358 ("[T]he key is whether the plaintiff had fair notice of the defects and a meaningful chance to fix them. If that chance is afforded and the plaintiff fails to remedy the defects, the district court does not abuse its discretion in dismissing the case with prejudice on shotgun pleading grounds.").

---

[20] Plaintiffs do not request leave to amend now, either. In response to SMB's motion, they assert only in passing that "an amendment would not be futile"; they do not develop this argument or affirmatively request leave to amend. Doc. 150 at 24 n.33 (internal quotation marks omitted). Rather, they assert that the Second Amended Complaint does not constitute a shotgun pleading and describe SBMC's and the City's shotgun-pleading arguments as "unscholarly," "unprofessional," and "not reflect[ing] the letter and . . . spirit of Rules 8 and 10." *Id.* at 22; Doc. 152 at 8–9. Earlier, before the Court dismissed the First Amended Complaint as a shotgun pleading, Plaintiffs alternatively requested leave to file a second amended complaint "in order to comport with the evidence which they have thus far obtained in evidence" in response to the Department's motion, Doc. 39 at 8, which did not raise the shotgun-pleading issue (Doc. 13). They also requested an extension of the CMSO's deadline to amend the pleadings, arguing that they "should be allowed to file an [a]mended [c]omplaint in order to tailor their claims to the discovery presented in this action, after the conclusion of discovery." Doc. 53 at 3. As previously mentioned, when the court dismissed the First Amended Complaint as a shotgun pleading, it *sua sponte* gave Plaintiffs leave to file an amended pleading and denied the request for an extension of that deadline, explaining any party seeking an extension of a CMSO deadline following the filing of the Second Amended Complaint could move for such relief. Doc. 97. In January of 2021, Plaintiffs sought leave to file a third amended complaint (Doc. 159), but they withdrew that motion (Docs. 241, 271).

Nonetheless, although the Second Amended Complaint constitutes a shotgun pleading, the Court will go through the pleading in an effort to construe the claims and resolve the motions to dismiss on the merits, as best that they can be determined.

### D. Motions to Dismiss and Remaining Motions

#### i.  *Motion for Reconsideration and Department's Motion to Dismiss*

##### 1.  <u>Motion for Reconsideration: Objection to Order of Dismissal and Motion to Vacate (Doc. 282)</u>

Three days after the Court held oral argument, LMA and Hundley filed their "Motion for Reconsideration: Objection to Order of Dismissal and Motion to Vacate" (Doc. 282). They move under "Rules 59 and 60" of the Federal Rules of Civil Procedure for the Court to vacate its oral order granting the Department's Motion to Dismiss and for an order denying the Motion to Dismiss.[21] Doc. 282 at 1, 24. Alternatively, they seek a rehearing on the Motion to Dismiss. *Id.* at 24.

The Court will deny the motion. LMA and Hundley argue throughout the motion that the Court's reasoning lacks factual and legal support. But they overlook the Court's instructions during oral argument. There, although the Court indicated that it would grant the Department's Motion to Dismiss, the Court explicitly advised the parties, "[O]bviously you all should rely upon a written order." Doc. 298 at 30:1–

---

[21] LMA and Hundley fail to specify the relevant provisions of Rules 59 and 60 under which they seek relief. The Court presumes that they seek relief under Rule 59(e), which provides that a "motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." Fed. R. Civ. P. 59(e). Given the numerous grounds for relief in Rule 60, the Court cannot glean from the motion which provision LMA and Hundley seek to proceed under.

2. When LMA and Hundley filed this motion, the Court had not issued the written order. Thus, despite the Court's instructions for the parties to rely upon a written order, which would formally articulate the Court's ruling and accompanying reasoning, LMA and Hundley asked the Court to "vacate" the Court's oral order without awaiting the written order. They argue that the Court's ruling lacks factual and legal support without even knowing the final reasoning for the Court's ruling. As such, their request is premature. For the same reasons, any request in the motion for the Court to vacate "any related written orders that are based upon the Oral Order" is also premature.

Their alternative request for rehearing also lacks merit. Neither the Federal Rules of Civil Procedure nor the Local Rules require the Court to hold oral argument on a motion to dismiss. Indeed, the Court rarely holds oral argument on motions to dismiss. Here, the Court graciously provided the parties with the opportunity to present argument as to the pending motions to dismiss, given the lack of clarity and pleading deficiencies in the Second Amended Complaint. The oral argument lasted for nearly three hours. Doc. 278 at 1. LMA and Hundley now complain that nearly three hours was not enough time. Doc. 282 at 3 n.4. But the Court allowed counsel to address any argument they desired to address during that time. How counsel elected to use that time was up to them. Counsel received more than sufficient time to present argument. No argument in this motion warrants rehearing.

Therefore, based on the foregoing analysis, the Court will deny this motion.

2. **Motion to Dismiss Second Amended Complaint With Prejudice (Doc. 112)**

The Court construes the Second Amended Complaint as bringing only two claims against the Department: Counts III and IV. The Department moves to dismiss those claims because (1) Eleventh Amendment Immunity bars them; (2) the Department does not constitute a "person" under 42 U.S.C. § 1983; and (3) the Second Amended Complaints does not set forth a plausible cause of action for libel (Doc. 112). Plaintiffs Lincoln Memorial Academy and Hundley oppose (Doc. 113). For the following reasons, the Court will grant the Department's motion to dismiss.

As explained above, the Second Amended Complaint labels Count III as a "Tort Claim Against the Florida Department of Education" and "Commissioner of Educ[a]tion Richard Corcoran" by LMA. Doc. 108 at 31 (internal quotation marks omitted). A footnote indicates that LMA brings this claim "[p]urusant to the 13th Amend., U.S. Const., 42 U.S.C. § 1981(c) ('Make and Enforce Contracts'); 14th Amend., U.S. Const., 42 U.S.C. § 1983 ('Deprivation of Civil Rights'). *Id.* at 31 n.45. This claim by LMA alleges that the Department violated Hundley's right to "make and enforce contracts" with SBMC. *Id.* at ¶70. The letters from Corcoran, whom the Department "acted through," "constituted the tort of libel" because they were untruthful and scandalous. *Id.* at ¶72. Corcoran asked SBMC and the board of LMA to remove Hundley from his position as principal on the basis of allegedly false information—specifically, the assertion that Hundley could not work near children. *Id.* at ¶73. And LMA alleges that "Defendant State of Florida/Department of

Education could reasonable foresee the consequences of its tortious, libelous and defamatory actions." *Id.* at ¶73(B). Count IV is nearly identical, except Hundley brings that claim.

Because Counts III and IV are similar and Hundley brings Count IV, the Court begins with that claim. The Court construes Count IV as bringing a claim under § 1983 for allegedly violating Hundley's rights under § 1981.[22] *See Butts*, 222 F.3d at 893 (stating that § 1983 constitutes the exclusive remedy against state actors for violations of rights contained in § 1981). Count IV seeks, among other remedies, judgment for compensatory and punitive damages and injunctive relief.

The Department moves to dismiss Count IV based on Eleventh Amendment immunity. Doc. 112 at 6–9. The Eleventh Amendment provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "Absent waiver, neither a State nor agencies acting under its control may be subject to suit in federal court." *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993) (internal quotation marks omitted). The Department is an arm of the State of Florida. *Stewart v. Smith*, No. 5:08cv280/RS/EMT, 2010 WL 4783021, at *3 (N.D.

---

[22] In response to the motion to dismiss, Hundley and LMA claim that they bring Counts III and IV under the Thirteenth Amendment and Sections 1 and 3 of the Civil Rights Act of 1866. Doc. 113 at 4. As explained above, section 1 of the Civil Rights Act included language found codified today at § 1981(a), *Comcast Corp.*, 140 S. Ct. at 1015, and § 1983 serves as the exclusive remedy against state actors for violations of § 1981, *Butts*, 222 F.3d at 893

Fla. Oct. 25, 2010), *report and recommendation adopted*, No. 5:08cv280/RS-EMT, 2010 WL 4789143, at *1 (N.D. Fla. Nov. 17, 2010); *see* Florida Statutes § 20.15 (creating the Department of Education in accordance with section 2, Article IX of the Florida Constitution and specifying that the State Board of Education serves as the head of the Department); *Williams v. Dist. Bd. of Trs. of Edison Comm. Coll., Fla.*, 421 F.3d 1190, 1193 (11th Cir. 2005) (describing the State Board of Education as "an entity that is clearly an arm of the state").

"Three general exceptions are applicable to the Eleventh Amendment's jurisdictional bar: (1) a state's immunity may be abrogated by act of Congress under section 5 of the Fourteenth Amendment; (2) a state may waive its sovereign immunity; or (3) the claim may fall within the confines of *Ex parte Young* [209 U.S. 203 (1908)]." *Camm v. Scott*, 834 F. Supp. 2d 1342, 1347 (M.D. Fla. 2011). "Congress has not abrogated eleventh amendment immunity in section 1983 cases." *Carr v. City of Florence*, 916 F.2d 1521, 1525 (1990). And Florida's limited waiver of sovereign immunity in § 768.28 of the Florida Statutes does not constitute consent to be sued in federal court under § 1983. *See Gamble v. Fla. Dep't of Health & Rehabilitative Servs.*, 779 F.2d 1509, 1515 (11th Cir. 1986); *see Camm*, 834 F. Supp. 2d at 1348 ("The State of Florida has not waived sovereign immunity for § 1983 actions generally.").

Because Congress has not abrogated Eleventh Amendment immunity for § 1983 actions and Florida has not consented to be sued in federal court under § 1983, the Eleventh Amendment bars this claim against the Department. During oral argument, Plaintiffs' counsel pointed out that the claim seeks injunctive relief as a remedy. Doc.

298 at 25:12–17, 26:5–6. To be sure, "the Eleventh Amendment does not bar suits against state officers seeking prospective equitable relief to end continuing violations of federal law." *Martino v. Campbell*, No. 8:20-cv-694-VMC-SPF, 2020 WL 2307559, at *2 (M.D. Fla. May 8, 2020) (internal quotation marks omitted). Indeed, under *Ex Parte Young*, "a suit alleging a violation of the federal constitution against a state official in his official capacity for injunctive relief on a prospective basis is not a suit against the state and, accordingly does not violate the Eleventh Amendment." *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011). When construing Count IV as against the Department, *Ex Parte Young* is inapplicable because Hundley does not bring the claim against a state officer. *See Maynard v. Fla.*, No. 5:14-cv-239-ACC-PRL, 2014 WL 12872819, at *3 (M.D. Fla. May 28, 2014) (finding *Ex Parte Young* inapplicable because the plaintiff did not sue a state official in an official capacity for prospective injunctive relief), *report and recommendation adopted*, No. 5:14-cv-239-ACC-PRL, 2014 WL12872820, at *1 (M.D. Fla. June 23, 2014). As such, Eleventh Amendment immunity bars Count IV.

Even if the Court construes the claim as an official-capacity claim against Corcoran, Eleventh Amendment immunity still bars the claim. Count IV's label indicates that Hundley brings the claim against both the Department and Corcoran. In the body of the claim, he alleges that the "Department" violated Hundley's right to "make and enforce contracts" with the School District of Manatee County and that the Department acted "through" Corcoran, whom he identifies as a "policy-maker as per 42 U.S.C. § 1983." Doc. 108 ¶¶83–84. "A suit against a state official in his or her

official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). As indicated above, Congress has not abrogated Eleventh Amendment immunity for § 1983 actions and Florida has not consented to be sued in federal court under § 1983. To the extent that Hundley seeks to rely upon *Ex Parte Young*, although Corcoran is an official whom Hundley sues in an official capacity, this claim does not seek injunctive relief on a prospective basis. Rather, Hundley complains of the Department's violation of Hundley's right to make and to enforce contracts with the School District of Manatee County as a result of Corcoran's letters in 2019. As such, *Ex Parte Young* is inapplicable. *See Martino*, 2020 WL 2307559, at *2 ("These are alleged past wrongs, not ongoing violations.").

The Department also moves to dismiss Count IV because it does not constitute a "person" within the meaning § 1983.[23] Doc. 112 at 9–11. The Court agrees. *See Irwin v. Miami-Dade Cnty. Pub. Schs.*, 398 F. App'x 503, 507 (11th Cir. 2010) (stating that the Department is not a "person" who can be sued under § 1983). Further, even if the

---

[23] In relevant part, § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

Court construes this claim as an official-capacity claim against Corcoran, the claim still fails because Corcoran, as a state official acting in an official capacity, does not constitute a "person" within the meaning of § 1983. *See Will*, 491 U.S. at 71 ("[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983."). Therefore, Count IV is due to be dismissed with prejudice on this ground. *See Topping v. U.S. Dep't of Educ.*, No. 2:09-cv-396-JES-DNF, 2012 WL 397809, at *8 (M.D. Fla. Feb. 8, 2012), *aff'd*, 510 F. App'x 816 (11th Cir. 2013).

Even if this claim somehow survived the Eleventh Amendment immunity and § 1983 analysis above, it does not state a claim for relief for violation of § 1981 via § 1983 or under § 1983 for violation of the Fourteenth Amendment. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (requiring a complaint to contain sufficient factual matter, which, if accepted as true, states a plausible claim on its face).[24]

Further, even if the Court construes this claim as a claim under the Thirteenth Amendment, the claim lacks sufficient factual matters to state a plausible claim for relief. The Thirteenth Amendment provides that "[n]either slavery nor involuntary servitude, except as punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII, § 1. As explained above, a plaintiff seeking to bring a claim under the Thirteenth Amendment must proceed under one the Thirteenth Amendment's implementing statutes, as the Amendment itself does not

---

[24] Counts III and IV incorporate only paragraphs 1 through 35 from the factual section. Doc. 108 ¶¶

provide a cause of action. *Gomez*, 2012 WL 1069186, at *2. In *United States v. Kozminski*, the Supreme Court observed that "in every case in which this Court has found a condition of involuntary servitude, the victim had no available choice but to work or be subject to legal sanction." 487 U.S. 931, 943 (1988). But the alleged facts supporting Count IV, which the Court must accept as true, do not indicate that Hundley had no available choice but to work or be subject to legal sanction as a result of any action or omission by the Department or Corcoran. As alleged, the EPC, not the Department, revoked Hundley's certificate. As framed, this claim focuses on the purportedly untruthful and scandalous nature of Corcoran's letters. The Second Amended Complaint does not plausibly allege that these letters exposed Hundley to a condition of involuntary servitude. *See Jones v. Ocwen Fin. Corp.*, No. 6:19-cv-1061-RBD-LRH, 2019 WL 6182822, at *4 (M.D. Fla. June 26, 2019) ("Jones has not alleged that she was compelled to continue her employment with [the defendant] or that she was otherwise subjected to involuntary servitude"), *report and recommendation adopted*, No. 6:19-cv-1061-RBD-LRH, 2019 WL 3798467, at *3 (M.D. Fla. Aug. 13, 2019). Rather, as alleged, the letters implored Hundley's *removal* and purportedly resulted in the School District's takeover of LMA. Doc. 108 ¶¶30, 86(A).

Additionally, Count IV fails to state a claim for defamation, which includes libel, under Florida law.  Defamation includes libel and slander. *Alan v. Wells Fargo Bank, N.A.*, 604 F. App'x 863, 865 (11th Cir. 2015). To state a claim for defamation— libel or slander—under Florida law, a plaintiff must allege that "(1) the defendant published a false statement (2) about the plaintiff (3) to a third party and (4) that the

falsity of the statement caused injury to the plaintiff." *Id.* (internal quotation marks omitted); *Matonis v. Care Holding Grp., L.L.C.*, 423 F. Supp. 3d 1304, 1315 (S.D. Fla. 2019). The Second Amended Complaint identifies the false statement in Corcoran's letters as the statement that Hundley could not work near children. Doc. 108 ¶86. Further, the Second Amended Complaint alleges that Corcoran "knowingly and intentionally misstated the language of the official orders which suspended Mr. Hundley's licenses" in that the EPC's final order neither restricted Hundley from holding an administrative position at a charter school nor precluded him from holding a position that brings him onto a public school campus while students are present. *Id.* at ¶¶32–33.

Hundley does not plausibly allege that the statements in Corcoran's letters are false, though. As the Department highlights, the EPC has the authority to suspend the educator certificate of any instructional personnel or school administration for up to 5 years, "thereby denying that person the right to teach or otherwise be employed by a district school board or public school in any capacity requiring direct contact with students for that period of time . . . ." Fla. Stat. § 1012.795(1). Therefore, the statements that Hundley could not work near children or work in a position that brings him onto a public school campus while students are present are true. Even when accepting the allegations as true, Hundley does not plausibly allege that any statement that he could not "hold[] an administrative position within a Charter School" constitutes a false statement that caused injury to him. To survive a Rule 12(b)(6) motion, the Second Amended Complaint must plead sufficient factual content that permits the Court to

draw the reasonable inference that the Department is liable for this misconduct. *See Iqbal*, 556 U.S. at 678 (internal citation omitted). Hundley does not allege, for example, that he could hold an administrative position at LMA in light of the revocation of his educator's certificate for five years. He simply labels this statement as false because the EPC order did not expressly discuss whether he could hold an administrative position. Hundley argues in the response to the Department's motion that he was preparing to work in the role of a "remote school administrator," which would have provided him with only "indirect contact" with any students and would not have required him to go onto the campus of LMA while students were present. But the Second Amended Complaint does not include these allegations, and Hundley may not amend the pleading through a response to a motion to dismiss. *See Jallali v. Nova Se. Univ., Inc.*, 486 F. App'x 765, 767 (11th Cir. 2012). Therefore, Count IV fails to state a claim for defamation.

Finally, to the extent that Hundley intends to bring a claim for tortious interference with a contract under Florida law in Count IV, he fails to state a claim. To state a claim for tortious inference, a plaintiff must allege: "(1) the existence of a business relationship or contract to which a plaintiff is a party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the contractual breach; (4) the absence of justification or privilege; and (5) the plaintiff suffered damages from the breach." *Fernandez v. Haber & Ganguzza, LLP*, 30 So. 3d 644,

646 (Fla. 3d DCA 2010).[25] Although Hunley mentions tortious inference with a contract in the response to the Department's motion to dismiss and argues that the Department "tortiously interfered with his right to "make and enforce contracts," Doc. 113 at 12, 14, the Second Amended Complaint lacks allegations supporting a claim for tortious inference with a contract within Count IV. For example, the Second Amended Complaint does not plausibly allege that the Department or Corcoran intentionally procured a contractual breach between Hundley and another entity. As such, Count IV fails to state a claim for tortious inference with a contract.

In concluding this alternative failure-to-state-a-claim analysis, the Court notes that, like the other plaintiffs, Hundley does not request leave to amend. Plaintiffs previously requested leave to file a third amended complaint (Doc. 159), but they withdrew that motion (Docs. 241, 271). "A district court is not required to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court." *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002). Plaintiffs, who are represented by counsel, have received several opportunities to amend their operative pleading. They have amended twice since initiating this action: nearly one month after filing this action and then after the Court *sua sponte* gave them leave to correct shotgun-pleading deficiencies. Although Plaintiffs have stated in

---

[25] The elements for a claim of tortious interference with a contract are "substantially similar" to elements for a claim of tortious inference with a business relationship. *AMG Trade & Distrib., LLC v. Nissan N. Am., Inc.*, 813 F. App'x 403, 406 (11th Cir. 2020).

passing that leave to amend would not be futile, they have neither developed that argument nor affirmatively requested leave to amend. Therefore, the Court will dismiss Count IV with prejudice. *See Anderson v. Ahluwalia*, No. 22-10961, 2022 WL 3156409, at \*4 (11th Cir. Aug. 8, 2022) ("If the district court had properly dismissed all of Plaintiffs' Count I negligence claims for failure to state a claim, then, under our rule in *Daewoo*, it would not have been required to sua sponte give Plaintiffs a chance to amend before dismissing with prejudice."); *Pitts v. Grant*, No. 21-12759, 2022 WL 1117454, at \*2 (11th Cir. Apr. 14, 2022) (upholding the district court's dismissal with prejudice where the plaintiff had failed to take advantage of opportunities to amend under Rule 15).

Because Count III is nearly identical to Count IV, except LMA brings that claim instead of Hundley, it is also due to be dismissed.[26] For the same reasons as above, Eleventh Amendment immunity bars the claim and neither the Department nor Corcoran constitutes a "person" under § 1983. Further, for the same reasons as above, except as to LMA, Count III does not state a claim for relief for violation of § 1981 via § 1983, a claim under § 1983 for violation of the Fourteenth Amendment, a claim for violation of the Thirteenth Amendment, a claim for defamation, or a claim for tortious

---

[26] The basis for LMA's standing to bring this "tort claim" against the "Department of Education" and "Commissioner of Educ[a]tion Richard Corcoran" is unclear, given that the body of the claim alleges that the Department committed "the tort of libel" against Hundley and violated his right to "make and enforce contracts" with the School District of Manatee County. But the Department does not address this issue in its motion.

interference with a contract. Because, like Count IV, LMA does not request leave to amend, the Court will dismiss Count III with prejudice.

Therefore, the Court will grant the Department's motion to dismiss and dismiss Counts III and IV with prejudice.

### ii. *City of Palmetto's Motion to Dismiss Second Amended Complaint With Prejudice (Doc. 119)*

The Court construes the Second Amended Complaint as bringing only one claim against the City: Count II. The City moves to dismiss that claim with prejudice under Rule 12(b)(6) (Doc. 119). For the reasons set forth below, the Court will grant the City's motion.

The Second Amended Complaint as a "'Tort' Claim" by LMA against the City "for foreseeable damages caused therefrom for interference with third party contract." Doc. 108 at 27. Like the labels for other claims, the label for this claim indicates that LMA brings the claim "[p]ursuant to the 13th Amend., U.S. Const., 42 U.S.C. § 19871(c) ('Make and Enforce Contracts'); 14th Amend., U.S. Const., 42 U.S.C. § 1983 ('Deprivation of Civil Rights'). *Id.* at 27 n.33. LMA alleges that the City aided and abetted the School District of Manatee County through its assistance "with helping to create, organize, or fabricate evidence (e.g., an alleged past-due water bill) which the School District of Manatee County relied upon to revoke LMA's charter." *Id.* at ¶52. According to LMA, although the LMA water bill was current from June 18, 2019 until July 22, 2019, Bryant ordered the City's utility billing supervisor to create and mail a 45-day delinquency shut-off notice, which effectively revoked or canceled the

"repayment agreement" between LMA and the City. *Id.* at ¶57. Identifying Bryant as a "policy-maker" whose "actions and decisions constitute actions that are 'under color of law' under 42 U.S.C. § 1983," LMA alleges that her actions "constituted the constitutional tort of 'interference with a third-party business interest' or 'interference with a contractual relationship.'" *Id.* at ¶59(A). LMA also alleges that Bryant's actions, as described within Count II, violated Section 1 of the Thirteenth Amendment and 42 U.S.C. § 1981(c). *Id.* at ¶59(B).

Given these allegations, LMA seems to bring claims for tortious interference with a contract or business relationship under Florida law, violation of the Thirteenth Amendment, violation of § 1981 via § 1983, and possibly a claim for violation of the Fourteenth Amendment here. In its response to the City's motion to dismiss, LMA recites the elements for a claim for inference with a contract or business relationship under Florida law and argues that the City "has committed a constitutional tort of interference with a business relation or contract, in violation of the Thirteenth Amendment and (or) 42 U.S.C. § 1981(c) (the Civil Rights Act of 1866)." Doc. 152 at 7 n.1 (internal quotation marks omitted). Because LMA suggests that the City violated 42 U.S.C. § 1981, which serves as an implementing statute for the Thirteenth Amendment, as a result of "constitutional" tortious interference with a contract or business relationship, the Court construes Count II as bringing a claim under § 1983 for violation of § 1981.

As explained above, LMA must bring this § 1981 claim via § 1983 since the City is a state actor. *King*, 576 F. App'x at 930; *LeCounte*, 162 F. Supp. 3d at 1301 (applying

this rule where the plaintiff brought a § 1981 claim via § 1983 against a city). "[T]o impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004); *see Hoefling v. City of Miami*, 811 F.3d 1271, 1279–80 (11th Cir. 2016) (identifying the different methods of establishing municipal liability under § 1983 as evidentiary standards, not pleading standards, and explaining that the plaintiff needed to only "allege a policy, practice, or custom of the City" that caused the injury to survive a Rule 12(b)(6) motion). "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997). "A custom is a practice that is so settled and permanent that it takes on the force of law." *Id.*

Even assuming for purposes of this analysis that a charter school like LMA can bring a § 1983 claim, LMA must allege a custom or policy of the City caused LMA's purported injury. An incorporated paragraph alleges that the "§ 1983 'custom or usage,' as previously described in paragraphs 11-16, has negatively impaired the employment or contractual relations of each of the Plaintiffs in this lawsuit" and that "each of the Plaintiff's contracts (including employment contracts) were materially changed, modified, rescinded, revoked, or terminate by one or all of the named Defendants 'under color of State law' pursuant to a long-standing and widespread

'custom, or usage' within the School District of Manatee County . . . ." *Id.* at ¶18. The Second Amended Complaint describes that custom or usage as: (1) providing inferior educational resources to "majority-black African American public schools" compared to "majority-white public schools in Manatee County"; (2) discriminating or retaliating against teachers and administrators who speak out against or take steps to change racially discriminatory treatment; and (3) discriminating against African-American teachers and employees within the Manatee County Public School System. *Id.* at ¶¶18(A)–(C). Other incorporated paragraphs allude to a custom or usage of widespread racial discrimination within the School District of Manatee County, not the City.[27] *Id.* at ¶¶17, 19. These allegations do not plausibly allege that a custom or policy of the City caused LMA's injury. Nor do the allegations within Count II indicate that the City, through Bryant or otherwise, acted in accordance with a policy or custom. As such, Count II fails to state a claim under § 1983.

To the extent that LMA seeks to bring a claim under Count II for violation of the Thirteenth Amendment, that claim also fails. A charter school, LMA does not plausibly allege that the City subjected LMA to slavery or involuntary servitude. *See* U.S. Const. amend. XIII, § 1; *Kozminski*, 487 U.S. at 943.

---

[27] An unincorporated paragraph also alleges that the City's alleged repayment agreement constitutes a "customary practice" among charter schools experiencing financial difficulties. Doc. 108 ¶¶41, 51. Although Count II does not incorporate this paragraph, considering it would not change the conclusion.

Finally, to the extent that LMA seeks to bring a claim under Florida law for tortious interference with a contract or business relationship, it fails to state a claim for relief.[28] As highlighted above, to state a claim for tortious inference, a plaintiff must allege: "(1) the existence of a business relationship or contract to which a plaintiff is a party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the contractual breach; (4) the absence of justification or privilege; and (5) the plaintiff suffered damages from the breach." *Fernandez*, 30 So. 3d at 646; *see AMG Trade & Distrib.*, 813 F. App'x at 406. The City, which interprets this claim as one for tortious interference, argues that any intentional and unjustified interference is absent from the Second Amended Complaint. Doc. 119 at 10. In support, the City argues that LMA was delinquent in the payment of its utility bill and, under the City's ordinance, the City possessed the right "to try and collect the monies from LMA for the outstanding utility bill," which "does not (and cannot) give rise to a claim for tortious interference . . . ." *Id.* at 11.

Because the City raises a Rule 12(b)(6) argument, the question is whether the Second Amended Complaint, together with its exhibits, states a claim for relief that is plausible. *See Iqbal*, 556 U.S. at 678. As such, the Court looks to the Second Amended Complaint to determine whether LMA states sufficient factual matter about the City's alleged intentional and unjustified interference. Before turning to the allegations, the

---

[28] During oral argument, Plaintiffs' counsel argued, "We are not bound to label whether we call it tortious interference, which is the common law term, you know, or just flat-out racial discrimination, intentional discrimination." Doc. 298 at 48:17–21.

Court notes that LMA seems to argue in response to the motion to dismiss that it need not allege facts supporting that element. Doc. 152 at 6–7. But, of course, *Twombly* and *Iqbal* demand *more* than "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). With these principles in mind, the Court examines the allegations.

As highlighted above, the Second Amended Complaint includes emails and invoices pertaining to the water bill as exhibits. LMA alleges that it had entered into a "repayment agreement" to alleviate LMA's payment difficulties. The City's June 13, 2019 utility bill to LMA indicated a "past due" amount of $12,439.23, listed "current charges" in the amount of $3,216.67, and indicated that the due date was July 5, 2019. Doc. 108 at 73. On the same day as this bill, the utility billing customer service supervisor advised LMA that the account was "currently past due," to which the LMA representative responded: "We will be back on track with the twice per month payments in July. 15th and 30th." Doc. 108 at 75. The Second Amended Complaint alleges that LMA issued a payment to the City on June 15, 2019, although the Second Amended Complaint does not allege the amount of this payment. Despite the repayment agreement, Bryant emailed Saunders on June 18, 2019, to advise that based on the City's "standard collection policies of [its] utility accounts," the City needed to take action and that a "termination of service date" would likely be mailed to LMA by the close of business that day. *Id.* at ¶26; Doc. 108 at 71. That day, LMA disbursed payment for $12,439.23—the same amount indicated as "past due" in the June 13, 2019 bill. Also on the same day, Bryant sent an email to Saunders, stating that LMA

had "brought [its] account up to current." Doc. 108 ¶26; Doc. 108 at 77. As such, the Second Amended Complaint alleges that LMA's water bill was "current" from June 18, 2019—when LMA disbursed a payment for $12,439.23—until "on or about July 22, 2019." Doc. 108 ¶27.

The July 22, 2019 email from the utility billing supervisor to Saunders indicated that a shut-off notice dated July 22, 2019, was attached "per [Bryant's] request." Doc. 108 at 138. The July 22, 2019 shut-off notice indicated that the minimum amount due was $3,216.67—the amount listed as "current charges" on the June 13, 2019 bill. As explained above, the July 22, 2019 notice also stated that the utility account was 45 days past due and paying $3,216.67 by the July 29, 2019 due date would avoid shut-off.

Under the City's Code of Ordinances, "[a]ll bills for utility services enumerated under this Ordinance shall be due and payable prior to 5:00 P.M., on the twentieth (20) day following the date of such bill." Doc. 119-1 at 22.[29] "Upon failure of any customer to pay for services rendered by the utility system within forty-five (45) days of billing, the city shall discontinue service to such customer and shall not furnish or

---

[29] The City provides a copy of the relevant ordinance, which the City passed in 2013 (Doc. 119-1). Although the City amended the quoted sections of the ordinance in August of 2019, those sections are materially the same as the sections in the copy provided by the City. City of Palmetto, Fla., Code of Ordinances §§ 29-36, 29-37. In response, LMA agrees that these sections govern, but argues that "[i]f the bill is still not paid on the 45th day, then a 45-day shut-off notice will be issued." Doc. 152 at 3. During oral argument, the City disputed this characterization. Regardless, the Court does not resolve the motion to dismiss on the basis of the language of the relevant sections.

permit customer to receive further service until all amounts owed to the city on the account are satisfied and paid in full. *Id.* at 23. Further:

> Utility service may be discontinued on delinquent accounts. Prior notice giving a date for termination of service shall be sent by standard U.S. mail to the billing address of record, or accomplished through personal service by posting the notice on the premises or hanging on the door in a clearly visible location such appropriate notice. If any customer shall fail to pay the delinquent amount within sixteen (16) days of said amount being due, a penalty charge equal to ten (10) percent of the amount of the current monthly charge shall be added on to the account. If the account has not been paid within forty-five (45) days of the billing date, discontinuance of service and disconnect shall be accomplished by the city. If such final due date falls on a Friday, the disconnect date shall be the next business day.

*Id.* at 23–24.

The City argues that "the alleged 'repayment agreement' was no longer in place" after LMA paid the $12,439.23 on June 18, 2019 and that "the Ordinance applied." Doc. 119 at 8. Relying on the ordinance, the City argues that the July 22, 2019 notice "contained a scrivener's error" because it should have stated that the account was "approaching 45 days past the bill date," thereby making it subject to shutoff. *Id.* at 9. But the City contends that this error "does not change the undeniable fact that LMA's account was subject to shut off on July 30, 2019." *Id.* at 9–10. On this basis, the City argues that the City was simply attempting to collect the money owed by LMA. *Id.* The problem with this argument, however, is that it requires the Court to

disregard LMA's allegation, which the Court must accept as true, that LMA had a payment agreement in place with the City.[30]

Regardless, a review of the Second Amended Complaint reveals that LMA does not plausibly allege that the City intentionally procured a breach of a contract. The core of this claim rests upon these allegations: that Bryant ordered the City's utility billing supervisor to create the June 22, 2019 notice, which stated an incorrect due date and revoked a repayment agreement; that Bryant and the utility billing supervisor knew, or should have known, that the bill was not past-due by 45 days; that the supervisor sent the notice to Saunders per Bryant's instructions; and that the July 22, 2019 notice was a basis for terminating the charter. The allegations do not nudge this claim across the line from conceivable to plausible. *See Iqbal*, 556 U.S. at 683. LMA does not plausibly allege that the City intentionally procured a breach of LMA's charter (or another contract). LMA argues in response that "there is too much

---

[30] The City also argues that the Court should consider a June 17, 2019 shut-off notice and a July 15, 2019 bill, both of which the City attaches to the motion to dismiss (Docs. 119-2, 119-3). A court "may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed." *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005). Further, "if the document's contents are alleged in a complaint and no party questions those contents, [a court] may consider such document provided that it meets the centrality requirement imposed in *Horsley* [v. Feldt, 304 F.3d 1125 (11th Cir. 2002)]. *Id.* First, the City argues that Plaintiffs incorporated the June 17, 2019 notice into the Second Amended Complaint by referring to it, admitting that LMA received notice of it, and making payment in response to receiving it. Doc. 119 at 8 n.3. But the Second Amended Complaint does not refer to the contents of the June 17, 2019 notice. Similarly, the City argues that the Court can consider the July 15, 2019 bill because Plaintiffs "reference the water bills by claiming that there was some fraud as to the amount owed by LMA." *Id.* at 8 n.4. This argument ignores the standard and does not indicate that the Second Amended Complaint refers to the contents of the bill.

circumstantial evidence" that "plainly show[s]" that the City "intentionally created a 'false or fraudulent' 45-day shut off notice on July 22, 2019, when the 45th due date would not occur until July 30, 2019." Doc. 152 at 8. But the Rule 12(b)(6) analysis does not depend upon evidence.[31]

Therefore, the Court will grant the City's motion and dismiss this claim under Rule 12(b)(6). As explained in the discussion of the Department's motion to dismiss, Plaintiffs do not request leave to amend. As such, the Court will dismiss this claim with prejudice. *See Wagner*, 314 F.3d at 542; *Anderson*, 2022 WL 3156409, at *4; *Pitts*, 2022 WL 1117454, at *2.

### iii.  *Motion for Order Granting Partial Summary Judgment and SBMC's Motion to Dismiss*

#### 1. <u>Motion for Order Granting Partial Summary Judgment in Favor of Plaintiff Lincoln Memorial Academy (Doc. 283)</u>

After oral argument, LMA filed its Motion for Order Granting Partial Summary Judgment in favor of Plaintiff Lincoln Memorial Academy, in which LMA asks the Court for an order granting its Motion for Partial Summary Judgment (Doc. 214). This motion lacks merit. The Court declines to grant the motion for partial summary judgment in light of the stay and the pending motions to dismiss. As such, the Court will deny this motion.

---

[31] Even if the Court construes Count II as bringing a plausible claim for tortious interference with a contract, the claim would still be due to be dismissed on the shotgun pleading grounds articulated above.

**2. Defendant Manatee County School Board's Motion to Dismiss Plaintiffs' Second Amended Complaint With Prejudice (Doc. 118)**

SBMC moves to dismiss claims on these grounds: (1) Hundley, Scott, Phillips, Ross, and Enrisma lack standing; (2) res judicata bars Count I; and (3) Counts VI, VIII, X, and XI fail to state a claim for relief under Title VII. (Docs. 118, 202, 301). Plaintiffs respond in opposition (Doc. 150, 295). For the reasons set forth below, the Court will grant-in-part and deny-in-part SBMC's motion to dismiss.

a.  Standing

SBMC argues that Hundley, Scott, Phillips, Ross, and Enrisma lack standing because they "cite to the School Board's rescission of the Charter as the source of alleged discrimination, racial harassment, and retaliation," even though they are not parties to the charter. Doc. 118 at 16. This argument is unpersuasive.

Absent standing, a district court lacks subject-matter jurisdiction. *McGee v. Solicitor Gen. of Richmond Cnty.*, 727 F.3d 1322, 1326 (11th Cir. 2013). The "irreducible constitutional minimum" of standing consists of three elements. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (internal quotation marks omitted). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* Where a case is at the pleading stage, "the plaintiff must 'clearly . . . allege facts demonstrating' each element." *Id.* (alterations in original) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)). An injury-in-fact is an invasion of a legally protectable interest that is (a) concrete and particularized and (b) actual or imminent, rather than

conjectural or hypothetical. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). A legally protectable interest is "something more than an economic interest"—"[w]hat is required is that the interest be one which the substantive law recognizes as belonging to or being owned by the applicant." *Mt. Hawley Ins. Co. v. Sandy Lake Props., Inc.*, 425 F.3d 1308, 1311 (11th Cir. 2005) (internal quotation marks omitted and original emphasis removed).

SBMC's argument that Hundley, Scott, Phillips, Ross, and Enrisma cite to the recission of LMA's charter as the source of the alleged discrimination, racial harassment, and retaliation mischaracterizes the claims. In Count V, Hundley alleges that he was discriminated against on the basis of race with respect to the terms, condition, and privileges of his "contract(s) with the School District of Manatee County in that he "was treated far less favorably" than Proue when the School District reported him to the Department of Education, which resulted in the revocation of his certificate. Thus, Count V does not focus on the rescission of LMA's charter. Similarly, Count VI alleges that the School District targeted Scott *after* the take-over of LMA, that she filed an EEOC charge of discrimination, that she was fired for insubordination, and that her termination related to her protected activities, including the EEOC charge of discrimination. Like Count V, Count VI does not ground the alleged discrimination, harassment, or retaliation in the rescission of LMA's charter. By way of another example, Count VII, which incorporates the allegation that the School District targeted Scott after the take-over because of her support of LMA, alleges that there is a pattern, practice, custom, or usage within the School District of

Manatee County "of retaliating against African American teachers and employees who protest racial discrimination of behalf of the victims of civil rights violations." Thus, Count VII also does not stem from the rescission of the charter. Because Counts VIII through XI contain similar allegations, SBMC's standing argument is not persuasive against those counts, either.[32] As such, the Court rejects this argument.

### b. Res Judicata

Initially, SBMC argued that the Court should "abstain from exercising jurisdiction over this action," to "the extent that the injunctive relief sought is reinstatement of LMA," to "avoid potentially interfering with [a] parallel state action." Doc. 118 at 18–20. However, because that state action concluded by the time that SBMC filed its reply, SBMC argued that res judicata bars Count I "and any other claim seeking reinstatement of the charter." Doc. 202 at 5. Because SBMC raised res judicata for the first time in its reply, the Court allowed LMA to respond to that argument through a supplemental response and allowed SBMC to file a response to the supplemental response. Doc. 298 at 72:18–25, 73:1–4. 77:12–20. After LMA filed its supplemental response (Doc. 295), SBMC filed its response to the supplemental response (Doc. 301).

---

[32] In Count VIII, Phillips alleges that the School Board's targeting of her resulted in, among other things, the rescission of the charter, not that the charter's rescission caused the targeting. Doc. 108 ¶126. Similarly, although Ross alleges in Count X that she was terminated "pursuant to a Charter-School Statute," she does not allege that the rescission of the charter was the source of the discrimination or retaliation. As such, these allegations do not alter the Court's conclusion.

Res judicata operates to preclude litigation of matters that were raised, or should have been raised, in an earlier lawsuit. *McKinnon v. Blue Cross & Blue Shield of Ala.*, 935 F.2d 1187, 1192 (11th Cir. 1991). "To invoke res judicata—also called claim preclusion—a party must establish four elements: that the prior decision (1) was rendered by a court of competent jurisdiction; (2) was final; (3) involved the same parties or their privies; and (4) involved the same causes of action." *TVPX ARS, Inc. v. Genworth Life & Annuity Ins. Co.*, 959 F.3d 1318, 1325 (11th Cir. 2020). The fourth element asks "whether a case arises out of the same nucleus of operative facts, or is based upon the same factual predicate, as a former action." *Id.* (internal quotation marks omitted). "[R]es judicata applies not only to the precise legal theory presented in the previous litigation, but to all legal theories and claims arising out of the same operative nucleus of fact." *Id.*

Res judicata is an affirmative defense. *Concordia v. Bendekovic*, 693 F.2d 1073, 1075 (11th Cir. 1982). "Generally, the existence of an affirmative defense will not support a motion to dismiss." *Quiller v. Barclays Am./Credit, Inc.*, 727 F.2d 1067, 1069 (11th Cir. 1984). "Nevertheless, a complaint may be dismissed under Rule 12(b)(6) when its own allegations indicate the existence of an affirmative defense," if that defense "clearly appears" on the complaint's face. *Id.*

The Second Amended Complaint labels Count I as a claim by LMA against the School District of Manatee County for the "Unlawful Termination of Contract by

School District." Doc. 108 at 25.[33] In Count I, LMA alleges that the School District "deprived LMA of its contracting rights, under color of law, because of the race of its founder, senior leader, officers and directors; and because of its mission to service an underprivileged African American community." *Id.* at ¶49. In support, LMA alleges that the School District unlawfully terminated the charter because "LMA was founded, organized, and administered by an African American" and "designed to redress the grievances of African American parents of underaged children with respect to the provision of their education and concerns that public-school funding for the public schools in their neighborhoods w[as] being sabotaged or diverted." *Id.* at ¶¶44(A), 44(B). Further, the School District did not afford LMA a "fair chance of success" and "sabotaged" LMA's funding. *Id.* at ¶45. Even if the School District had discovered the alleged administrative problems, it denied LMA "of statutory rights under Florida law to afford itself . . . a probationary period or financial rehabilitation plan to correct any problems." *Id.* at ¶48 (internal quotation marks omitted).

Previously, an administrative law judge considered "whether, pursuant to section 1002.33(8)(a)2., 3., and 4., and (c), Florida Statutes (2019), the Manatee County School Board ha[d] proved violations of law and other good cause to immediately terminate [the] charter school agreement with [LMA] dated February 27, 2018, due to the immediately and serious danger to the health, safety, and/or welfare

---

[33] Like other claims, the title of Count I includes a footnote stating that LMA brings Count I "[p]ursuant to the 13th Amend., U.S. Const., 42 U.S.C. § 1981(c) ('Make and Enforce Contracts'); 14th Amend., U.S. Const., 42 U.S.C. § 1983 ('Deprivation of Civil Rights')." Doc. 108 at 25 n.32.

of the students" of LMA. *Manatee Cnty. Sch. Bd. v. Lincoln Mem'l Acad., Inc.*, No. 19-4155, 2019 WL 4894993, at *1 (Fla. Div. Admin. Hrgs. Sept. 27, 2019). The administrative law judge concluded that the "School Board met its burden by clear and convincing evidence and that LMA's charter contract was appropriately and immediately terminated due to a serious and immediate danger to the health, safety, and/or welfare of LMA's students." *Id.* at *38. The administrative law judge held that clear and convincing evidence demonstrated that the School Board possessed a sufficient basis to act by immediately terminating LMA's charter under section 1002.33(8)(c), Florida Statutes. *Id.* As such, the administrative law judge ordered the denial of LMA's appeal and that the charter contract was terminated. *Id.*

On appeal to Florida's First District Court of Appeal, LMA argued that: (1) SBMC's termination of the charter violated due process; (2) SBMC "contributed to the problem" by failing to provide needed services and support; and (3) issues pertaining to non-instructional personnel and LMA's failure to obtain clearance letters should not have served as a factor in terminating the charter. *Lincoln Mem'l Acad., Inc. v. Manatee Cnty. Sch. Bd.*, 309 So. 3d 710, 713 (Fla. 1st DCA 2020). The court rejected those arguments and held that competent, substantial evidence supported the administrative law judge's ruling. *Id.* at 711, 714–15.

It is apparent from the face of the Second Amended Complaint that LMA's allegations in Count I arise out of the same nucleus of operative facts as the action before the Division of Administrative Hearings and the First District Court of Appeal. Indeed, as highlighted above, LMA complains that SBMC unlawfully terminated the

charter, which was the issue before the Division of Administrative Hearings and the First District Court of Appeal. Even if LMA styles this claim as arising under the Thirteenth Amendment, § 1981, the Fourteenth Amendment, or § 1983, res judicata applies because the doctrine applies to all legal theories and claims arising out of the same operative nucleus of facts. On its own, the Court also takes judicial notice that the final decisions from the Division of Administrative Hearings and the First District Court of Appeal involved LMA and SBMC.[34] *See* Fed. R. Evid. 201(b), (c)(1), (d); *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (stating that a court may take judicial notice of another court's order to recognize the "judicial act" that the order represents or the subject matter of the litigation). Therefore, res judicata bars Count I, and that claim is due to be dismissed with prejudice. As such, the Court will grant SBMC's motion to dismiss as to the res judicata argument.[35]

### c.   Failure to State a Claim

Finally, SBMC moves to dismiss Counts VI, VIII, X, and XI, arguing that those claims fail to state a claim under Title VII of the Civil Rights Act of 1964.[36] Doc. 118 at 21–24. As such, the Court examines Counts VI, VIII, X, and XI.

---

[34] SBMC provided a copy of the opinion of the First District Court of Appeal. (Doc. 138).

[35] Given this conclusion, the Court need not reach SBMC's collateral estoppel argument. Further, to the extent that SBMC argues that res judicata "bars any other claim seeking reinstatement of the charter," it has not sufficiently presented an argument for dismissal of any other claim under res judicata. Doc. 202 at 5.

[36] In moving to dismiss, SBMC emphasizes that it analyzes the claims as Title VII claims "without waiving [its] position on Plaintiffs' shotgun pleading." Doc. 118 at 22.

i. Count VI

The Second Amended Complaint labels Count VI as "Retaliatory Discharge Claim Against the School District of Manatee County Pursuant to Title VII of the 1964 Civil Rights Act." Doc. 108 at 41. Scott alleges that the School District "violated her rights under the Thirteenth Amendment . . . as implemented by civil rights as per Title VII of the 1964 Civil Rights Act." *Id.* at ¶113. She alleges that the School District's retaliatory termination of her constituted a "part of a pattern and practice' of reprisals against other similarly-situated co-Plaintiffs." *Id.* at ¶113(B). And she alleges that the School District retaliated against her when it terminated her employment. *Id.* at ¶113(A).

The Court construes Count VI as raising a claim against SBMC for retaliation under Title VII.[37] "It shall be an unlawful employment practice for an employer" to (1) "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race"; or (2) "limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a). In turn, Title VII's anti-retaliation provision provides:

---

[37] The response to SBMC's motion to dismiss indicates that Scott brings Count VI under Section 1 of the Thirteenth Amendment and Title VII of the Civil Rights Act of 1964. Doc. 150 at 23.

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a).

To state a viable claim for retaliation under Title VII, "a plaintiff must plead facts that plausibly support a finding that: (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was a causal link between the protected expression and the adverse action." *Stewart v. Jones Utility & Contracting, Inc.*, 806 F. App'x 738, 742 (11th Cir. 2020) (citing *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997)).

As shown above, "[s]tatutorily protected expression can be in the form of 'opposition' or 'participation.'" *Joseph v. Napolitano*, 839 F. Supp. 2d 1324, 1335 (S.D. Fla. 2012). Further, "'[t]o establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." *Glover v. Donahoe*, 626 F. App'x 926, 931 (11th Cir. 2015) (quoting *Shannon v. BellSouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (affirming the district court's dismissal of a Title VII retaliation claim). "[M]ere temporal proximity, without more, must be very close to suggest causation in Title VII retaliation case." *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1327–28 (11th Cir. 2020) (internal quotation marks omitted).

Although the Second Amended Complaint alleges that the SBMC placed Scott on administrative leave, SBMC "t[oo]k over" LMA, SBMC "targeted" her, and SBMC Administrator Willie Clark informed her that she was terminated, it never explicitly alleges that the SBMC employed her. Nonetheless, given the allegation that Clark informed her that she was terminated, the Court assumes that SBMC employed Scott.[38] The only mentions of her termination—identified as the retaliatory action— are that allegation and her statement in the attached affidavit that she was terminated due to "insubordination" and that "this alleged 'insubordination' related to her protected activities which occurred on August 23, 2019." Doc. 108-1 at 89–90. The Court assumes that Scott refers to an EEOC charge of discrimination that she filed following her suspension on or about August 23, 2019, *id.* at 88, not her "participation or perceived participation" in a demonstration, as her participation in the demonstration does not constitute an unlawful employment practice under Title VII.[39] Her termination qualifies as an adverse employment action. For causation, Scott contends that her termination for insubordination, which occurred only five weeks after her EEOC complaint, "related to" the protected activities, but Count IV lacks

---

[38] In moving to dismiss this claim, SBMC concedes that "LMA employees *may* have become School Board employees upon termination of the Charter" in accordance with Florida Statute § 1002.33(8)(c). Doc. 118 at 23 (emphasis added). In response, Plaintiffs argue that SBMC became "the employer" following the take-over, based on the charter's language and Title VII. Doc. 150 at 18 n.20.

[39] The response to SBMC's motion to dismiss attaches a charge of discrimination, which Scott filed, but that charge is dated January 18, 2020. Doc. 150-8 at 2. As with many of the other exhibits attached to the response, Plaintiffs do not provide any argument for why the Court should consider this exhibit in addressing the Rule 12(b)(6) argument here.

any allegation that SBMC was aware of her EEOC charge. Regardless, even if Count VI states a plausible claim for Title VII retaliation, it is due to be dismissed based upon the shotgun pleading analysis above.

To the extent that Count VI seeks to raise a claim under the Thirteenth Amendment, it fails to state a claim for violation of that Amendment, *see Kozminski*, 487 U.S. at 943; *Jones*, 2019 WL 6182822, at *4, and Plaintiffs do not request leave to amend, *see Wagner*, 314 F.3d at 542; *Anderson*, 2022 WL 3156409, at *4; *Pitts*, 2022 WL 1117454, at *2.

## ii.  Count VIII

As discussed above, the Second Amended Complaint labels Count VIII as "Retaliatory Discharge Claim Against the School District of Manatee County Pursuant to Title VII of the 1964 Civil Rights Act and the Thirteenth Amendment." Doc. 108 at 49.  Phillips alleges that per the allegations within Count VIII, the School District "violated her civil rights as her Title VII of the 1964 Civil Rights Act" and "as per 42 U.S.C. [§] 1983." *Id.* at ¶¶128–29.

The Court construes Count VIII as raising a claim against SBMC for retaliation under Title VII.[40] Count VIII alleges that SBMC targeted Phillips because of her proactive involvement in support of LMA, which resulted in her termination. It also alleges that Phillips, whom LMA initially hired to assist the registrar, engaged in

---

[40] The response to SBMC's motion to dismiss indicates that Phillips brings Count VIII under Section 1 of the Thirteenth Amendment and Title VII of the Civil Rights Act of 1964. Doc. 150 at 24.

protected activity when she filed a race-discrimination grievance at the School Board on July 23, 2019, in which she contended that she had been discriminatorily locked out of the registrar computer system and was unable to enroll new students. *Id.* at ¶126(B). She filed EEOC charges of discrimination for the same reasons in July of 2019 and August of 2019. *Id.* On August 23, 2019, the same day as the protest, she was placed on unpaid leave. *Id.* at ¶126(E). In her affidavit, attached to the Second Amended Complaint, she states that the basis for her termination was that she was still within her 90-day probationary period, but this was pretext for taking the retaliatory action. Doc. 108-1 at 93. Assuming that SBMC served as Phillips's employer, this claim *may* state a plausible claim for Title VII retaliation, based on these allegations. But, it is due to be dismissed based upon the shotgun pleading analysis above.

To the extent that Count VIII seeks to raise a claim under the Thirteenth Amendment, it fails to state a claim for violation of that Amendment. *See Kozminski*, 487 U.S. at 943; *Jones*, 2019 WL 6182822, at *4.

Finally, as mentioned above, Count VIII also alleges that SBMB has violated Phillips's civil rights under § 1983. Doc. 108 ¶129. Because Count VIII does not allege the requisite policy or custom, it fails to state a claim under § 1983.

### iii.   Count X

The Second Amended Complaint labels Count X as "retaliatory discharge by the School District of Manatee County was part of a pattern, practice, custom, and usage of racial discrimination within the public schools of Manatee County, in

violation of the Thirteenth Amendment and the Civil Rights Act of 1866 and 1871 (42 U.S.C. § 1983). Doc. 108 at 55."

The Court construes Count X as bringing a claim against SBMC for violation of § 1981 via § 1983.[41] Count X alleges that Ross claims that her retaliatory termination violated 42 U.S.C. § 1981(c) "which is asserted in this count as a claim under § 1983." *Id.* at ¶143(C). "A plaintiff seeking to impose liability on a municipality (school district) under § 1983 must identify a municipal 'policy' or 'custom' that caused a deprivation of federal rights." *Davis v. DeKalb Cnty. Sch. Dist.*, 233 F.3d 1367, 1375 (11th Cir. 2000); *see Doe v. Sch. Bd. of Miami-Dade Cnty.*, 403 F. Supp. 3d 1241, 1263 (S.D. Fla. 2019) ("[T]o state a claim [under § 1983] against a school board (as a unit of local government) for a constitutional violation, a plaintiff must allege that the school board has a policy or custom which was the moving force behind the alleged deprivation of her constitutional rights."). "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." *Sewell*, 117 F.3d at 489. On the other hand, "a custom is "widespread practice" that, "although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1482 (11th Cir. 1991) (internal quotation marks omitted).

---

[41] The response to SBMC's motion to dismiss indicates that Ross brings Count X under Section 1 of the Thirteenth Amendment and "the Civil Rights Act of 1866 (42 U.S.C. Section 1981(c))" and that "the claims arising under 42 U.S.C. § 1981(c) are the exact same claims as claims filed under 42 U.S.C. § 1983." Doc. 150 at 24.

These rules apply when a plaintiff brings a § 1981 claim via § 1983. *See*, *e.g.*, *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 702 (1989); *Webster v. Fulton Cnty.*, 283 F.3d 1254, 1257 (11th Cir. 2002); *LeCounte*, 162 F. Supp. 3d at 1301–02; *Booth v. Pasco Cnty.*, No. 8:09-cv-2621-JSM-TBM, 2010 WL 2757209, at *11 (M.D. Fla. July 13, 2010).

Count X does not plausibly allege the requisite "policy" or "custom." Count X alleges that "[t]here is a pattern, practice, custom or usage within the School District of Manatee County of retaliating against African American teachers and employees who protest racial discrimination on behalf of the victims of civil rights violations." *Id.* at ¶143(C). Count X does not allege a decision that was officially adopted by SBMC or created by an official of such rank that he or she acted on behalf of SBMC. Similarly, Count X does not allege a widespread practice that was so well settled as to constitute a custom or usage with the force of law. Even if Count X seeks to rely on the allegations of the other plaintiffs to allege a policy or custom, that Scott, Phillips, Ross, and Enrisma were each somehow involved in the MCC4J protest on August 23, 2019, and suspended on the same day before later being terminated, it does not, without more, indicate a policy or custom. *See Craig v. Floyd Cnty.*, 643 F.3d 1306, 1310 (11th Cir. 2011) ("A single incident of a constitutional violation is insufficient to prove a policy or custom even when the incident involves several employees of the municipality."); *Dayton v. City of Marco Island*, No. 2:20-cv-307-SPC-MRM, 2020 WL 2735169, at *4 (M.D. Fla. May 26, 2020) ("But the conduct occurred at the same meeting (seemingly minutes apart) because Brechnitz decided not to allow speech about the Councilor during Citizens' Comments that day. In other words, the allegedly unconstitutional

conduct was a single instance."). As such, Count X does not state a claim for violation of § 1981 via § 1983.[42]

The Court does not interpret Count X as bringing a claim under Title VII, even though SBMC does. The response to SBMC's motion indicates that only Counts VI and VIII arise under Title VII. Doc. 150 at 24. During oral argument, Plaintiffs' counsel also described Count X as arising under § 1983. Doc. 298 at 70:4–5. Regardless, Count X also fails to state a claim for retaliation under Title VII. Paragraph 140 describes several "protected and concerted activities," such as Ross joining MCC4J and participating in the demonstration. Further, Ross's affidavit, which is attached to the Second Amended Complaint, describes the "protected concerted activities" as being approached by students who sought her guidance and assistance with participating in the protest and her belief that the students had a First Amendment right to engage in the protest. Doc. 108-1 at 95. None of these actions constitutes "statutorily protected expression" under Title VII, as they do not involve Ross opposing an unlawful employment practice under Title VII or making a charge, testifying, assisting, or participating in an investigation, proceeding or hearing under Title VII. As such, Count X fails to state a claim for retaliation under Title VII.

---

[42] For the same reasons, to the extent that Count X seeks to bring a claim for violation of the First Amendment or the Fourteenth Amendment, it fails to state such a claim. *See* Doc. 108 ¶140.

Finally, to the extent that Count X seeks to raise a claim under the Thirteenth Amendment, it fails to state a claim for violation of the that Amendment. *See Kozminski*, 487 U.S. at 943; *Jones*, 2019 WL 6182822, at *4.

Therefore, the Court will grant SBMC's motion to dismiss Count X under Rule 12(b)(6). As explained above, because Plaintiffs do not request leave to amend, the Court will dismiss this claim with prejudice. *See Wagner*, 314 F.3d at 542; *Anderson*, 2022 WL 3156409, at *4; *Pitts*, 2022 WL 1117454, at *2.

### iv.   Count XI

The Second Amended Complaint labels Count XI as "retaliatory discharge claim against the School District of Manatee County pursuant to 42 U.S.C. §§ 1981(c), 1988; Civil Rights Act of 1866, and the Thirteent[h] Amendment, U.S. Constitution." Doc. 108 at 63. The Court construes Count XI as bringing a claim for violation of § 1981 via § 1983.[43] However, as with Count X, Count XI fails to plausibly allege the requisite "policy" or "custom." Count XI alleges only that SBMC's "retaliatory termination of Plaintiff Enrisma was part of a 'pattern and practice' of reprisals against other similarly-situated co-Plaintiffs." *Id.* at ¶150(B). Count XI does not allege a decision that was officially adopted by SBMC or created by an official of such rank that he or she acted on behalf of SBMC. Count XI also does not allege a widespread

---

[43] The response to SBMC's motion to dismiss indicates that Enrisma brings Count XI under Section 1 of the Thirteenth Amendment and "the Civil Rights Act of 1866 (42 U.S.C. Section 1981(c))" and that "the claims arising under 42 U.S.C. § 1981(c) are the exact same claims as claims filed under 42 U.S.C. § 1983." Doc. 150 at 24. The response also emphasizes that only Scott and Phillips bring claims under Title VII, in Counts VI and VIII. *Id.* at 19.

practice that was so well settled as to constitute a custom or usage with the force of law. As explained above, that Scott, Phillips, Ross, and Enrisma were each somehow involved in the MCC4J protest on August 23, 2019, and suspended on the same day before later being terminated, does not indicate, without more, a policy or custom. *See Craig*, 643 F.3d at 1310; *Dayton*, 2020 WL 2735169, at *4. As such, Count XI fails to state a claim for violation of § 1981 via § 1983.[44]

Given the allegations within Count XI about Enrisma filing an EEOC charge of discrimination, which alleged retaliation against SBMC, on August 8, 2019, that she was suspended for insubordination on August 23, 2019, that Clark terminated her on October 3, 2019, and that she was informed that she had failed to properly clock in and out on August 23, 2019, but the charge was pretext and retaliation, Count XI *may* be able to state a plausible claim for retaliation under Title VII. But, even though SBMC interprets this claim as arising under Title VII, the response to SBMC's motion indicates only Counts VI and VIII arise under Title VII. Doc. 150 at 24. During oral argument, Plaintiffs' counsel also described Count XI as arising under § 1983. Doc. 298 at 70:4–5. As such, the Court does not construe this claim as arising under Title VII.

---

[44] For the same reasons, to the extent that Count XI seeks to bring a claim for violation of the First Amendment or the Fourteenth Amendment, it fails to state such a claim. *See* Doc. 108 ¶151. During oral argument, Plaintiffs' counsel argued that Enrisma "engaged in a protected activity as a public employee" and "[t]hat's covered under the Fourteenth Amendment, so . . . the First Amendment comes into play through the Fourteenth Amendment. Okay? That's why we need to keep that Fourteenth Amendment in there." Doc. 298 at 67:2–8.

Finally, to the extent that Count XI seeks to raise a claim under the Thirteenth Amendment, it fails to state a claim for violation of that Amendment. *See Kozminski*, 487 U.S. at 943; *Jones*, 2019 WL 6182822, at *4.

Therefore, the Court will grant SBMC's motion to dismiss Count XI under Rule 12(b)(6). As explained above, because Plaintiffs do not request leave to amend, the Court will dismiss this claim with prejudice. *See Wagner*, 314 F.3d at 542; *Anderson*, 2022 WL 3156409, at *4; *Pitts*, 2022 WL 1117454, at *2.

## III.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED**:

1. Plaintiffs' Motion for Judicial Notice of Certain Adjudicative Facts Contained in the Court Record (Doc. 296) is **GRANTED-IN-PART and DENIED-IN-PART.** The motion is **GRANTED** only to the extent that the Court takes judicial notice of the documents to which Plaintiffs point only for the purpose of judicially noticing that Plaintiffs have filed those documents. In all other respects, the motion is **DENIED**.

2. The Motion to Substitute/Motion to Join Commissioner of Education Richard Corcoran as a Party Defendant Pursuant to Rules 15 and 21 of the Federal Rules of Civil Procedure (Doc. 288) is **DENIED**.

3. The Motion for Reconsideration: Objection to Order of Dismissal and Motion to Vacate (Doc. 282) is **DENIED**.

4. Defendant Manatee County School Board's Motion to Dismiss Plaintiffs' Second Amended Complaint With Prejudice (Doc. 118) is **GRANTED-IN-PART and DENIED-IN-PART**. The motion is **GRANTED** as follows: the Second Amended Complaint is **DISMISSED WITH PREJUDICE** as a shotgun pleading; Count I is **DISMISSED WITH PREJUDICE** as barred by res judicata; Count VI is **DISMISSED WITH PREJUDICE** for failure to state a claim to the extent that it brings a claim for violation of the Thirteenth Amendment; Count VIII is **DISMISSED WITH PREJUDICE** for failure to state a claim to the extent that it brings a claim for violation of the Thirteenth Amendment or a claim under 42 U.S.C. § 1983; Count X is **DISMISSED WITH PREJUDICE** for failure to state a claim; and Count XI is **DISMISSED WITH PREJUDICE** for failure to state a claim. In all other respects, the motion is **DENIED**.

5. The City of Palmetto's Motion to Dismiss Second Amended Complaint With Prejudice (Doc. 119) is **GRANTED**. The Second Amended Complaint is **DISMISSED WITH PREJUDICE** as a shotgun pleading. Count II is **DISMISSED WITH PREJUDICE** for failure to state a claim upon which relief can be granted.

6. The Motion to Dismiss Second Amended Complaint With Prejudice (Doc. 112) is **GRANTED**. Count III and IV are **DISMISSED WITH PREJUDICE** for failure to state a claim upon which relief can be granted.

7. The Motion for Order Granting Partial Summary Judgment in Favor of Plaintiff Lincoln Memorial Academy (Doc. 283) is **DENIED**.

8. The Clerk is directed to **CLOSE** this case. Any pending motions that are not mooted by this Order will be addressed in due course.

**DONE AND ORDERED** in Tampa, Florida on December 30, 2022.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record and Unrepresented Parties, if any